[No. H017187. Sixth Dist. Apr. 27, 1999.]

ADELA BENAVIDEZ et al., Plaintiffs and Appellants, v.
SAN JOSE POLICE DEPARTMENT et al., Defendants and Respondents.

COUNSEL

Bien & Summers, E. Elizabeth Summers; Law offices of Sandra J. Springs and Sandra J. Springs for Plaintiffs and Appellants.

Joan R. Gallo, City Attorney, Ralph C. Greene, Chief Deputy City Attorney, and Steven J. Levine, Deputy City Attorney, Defendants and Respondents.

## OPINION

COTTLE, P. J.—After Adela Benavidez was attacked three separate times by her live-in boyfriend within one 24-hour period, she sued the City of San Jose (City), the San Jose Police Department (Police), Chief of Police Louis Cobarruviaz, and Police Officer Michael Lloyd for negligence, intentional infliction of emotional distress, negligent infliction of emotional distress, negligence per se, and violation of 42 United States Code section 1983 for failing to take adequate precautions to protect her and her son, Joey Benavidez.[1] Defendants moved for summary judgment on all causes of action, and the court granted the motion. Benavidez and her son appeal the court's decision only as to the first (negligence) and third (negligent infliction of emotional distress) causes of action. For reasons we shall explain, we affirm the judgment.

### FACTS

In 1993, plaintiff and her son Joey were living with plaintiff's boyfriend, Richard Cortez. Cortez verbally abused plaintiff and, on occasion, physically abused her as well. In August 1993, plaintiff had to call the Police because Cortez had beaten her up. She described the August 1993 incident as the only other incident "of equally serious physical abuse" as the incidents that are the subject of this lawsuit.

On the evening of December 11, 1993, plaintiff and Cortez went to a company party where Cortez had several drinks. When they arrived home, plaintiff and Cortez began arguing about his drinking and about her radio, and Cortez attacked her. He punched plaintiff, kicked her, and then threw her down the stairs. He took her car keys and was heading out the door when

---

[1] The suit was brought in the name of Adela Benavidez and Joey Benavidez. However, in this opinion, references to "plaintiff" are to Adela Benavidez. Plaintiffs also sued Adela's boyfriend for assault and battery, but that defendant and that cause of action are not part of this appeal. All references to defendants in this opinion therefore relate solely to the City/Police defendants.

plaintiff went running after him. She told him he could not take her car. He punched her in the eye and left. After he was gone, Benavidez called a women's shelter. The shelter asked her if she had transportation. She then phoned for a taxi, picked up her son at the babysitter's, and went to a motel. She did not call the police that night because she was embarrassed.

Plaintiff returned home about 10:30 or 11:00 a.m. the next morning after talking to Cortez on the phone. He told her he was moving out, and she told him to go ahead but to leave the house unlocked and to leave her car. When she arrived, however, the house was locked and her car was not there. As plaintiff began breaking into her house, Cortez arrived. He immediately started attacking her, and he threw two pots through her front windows. Plaintiff told Joey to call 911,[2] and when he did, Cortez fled, again in plaintiff's car. Joey's call was made at 11:39 a.m.

Officer Michael Lloyd and Sergeant Michael Ross arrived at plaintiff's house at 11:42 a.m. When Ross arrived, he told Joey to put down a stick he was holding and to "stop acting macho." Plaintiff was upset and kept changing the subject, and Lloyd had a hard time trying to get her to sit down and tell him what had happened. Plaintiff was holding her stomach and had to go to the bathroom because she was nauseous. She told the police that Cortez had beaten her up and taken her car, and that he might be at his mother's house. She gave them that address and a physical description of Cortez, which the police broadcast to other officers. Lloyd put out an "A[ll] P[oints] B[ulletin]" for Cortez for felony battery and car theft.

During the interview Lloyd asked plaintiff if she wanted an ambulance or if she wanted to go to the hospital. Each time she told him no. The police did not talk to plaintiff about staying in the apartment. Around 12:10 p.m. both officers left. In her deposition, plaintiff explained that she understood that Ross was "just leav[ing because] it was over" and that Lloyd was heading to Cortez's mother's house to see if he could find her car and apprehend Cortez. When she asked them what she should do if Cortez returned, they told her to call 911.

Within minutes of the police leaving, Cortez called. Joey picked up the phone, and Cortez began threatening him. Joey's mother told him to hang up. As soon as he did, the phone started ringing again, but plaintiff did not pick it up. This lasted for about 10 minutes.

Lloyd arrived at Cortez's mother's house at 12:18 p.m. Thus, the trip took him about eight minutes. He drove around the neighborhood looking for

---

[2]Joey told the 911 operator, "We are being attacked! . . . We are being attacked! . . . My, my, my, my mom's boyfriend. Call the police, please hurry!"

plaintiff's car. Not finding it, he decided to return to plaintiff's house to get additional information from her.

As Officer Lloyd was on his way back, Cortez reappeared at plaintiff's house. Plaintiff heard him at the screen door trying to break in, and she called 911. While she was on the phone with the 911 operator, Cortez moved over to the broken window, which he was attempting to enter. Plaintiff apparently dropped the phone at that point and ran up to the window, to keep him from coming in. From outside, Cortez reached in and grabbed plaintiff. He pulled a glass shard from the broken window and used it to stab her in the head and neck. Meanwhile, Lloyd and other officers arrived. They subdued Cortez by using Mace and a baton.

A transcript of the 911 call, time stamped 12:35 p.m., records plaintiff asking for help, then yelling at Cortez to go, warning him that police were on the way; it then records screams, then the voices of Officer Lloyd and other officers telling Cortez to get down on the ground. The transcript ends with plaintiff requesting an ambulance.

The City of San Jose Police Duty Manual and the Police Chiefs' Domestic Violence Protocol for Law Enforcement provided in 1993 that "Officers shall assist victims of domestic violence in the following manner: . . . [¶] Assist in making arrangements to transport the victim to an alternate shelter if the victim expresses a concern for safety or [if] the officer determines a need exists."

In March 1995, plaintiff and her son Joey filed suit against the City/Police defendants. On February 20, 1997, defendants moved for summary judgment. In opposition to the motion, plaintiff submitted a declaration in which she stated, inter alia, (1) "When Officer Lloyd and Sergeant Ross first arrived on the scene on December 12, 1993, Officer Lloyd announced, 'Don't worry, we're here!' or very similar words to that effect. I understood this as a statement that the officers had taken control of the scene and that they would protect me and my son Joey"; and (2) "During the interview by Officer Lloyd and Sergeant Ross on the morning of December 12, 1993, I *did* ask whether I could be taken to a shelter. The officers did not say 'yes' or 'no'; in fact, they did not respond to my inquiry in any manner." She also submitted a declaration from a police procedures expert who opined that a special relationship was created when the officers responded to plaintiff's 911 call, and the deposition testimony of a neighbor who felt that the police should not have left plaintiff without protection.

The trial court granted defendant's motion. In its written order, the court explained that the second, sixth and seventh causes of action were insufficient irrespective of the inconsistencies between the deposition testimony

and declaration of plaintiff Adela Benavidez. "As to the first and third causes of action, Ms. Benavide[z]' deposition testimony establishes that no special relationship was created between plaintiffs and defendant officers as a matter of law. To the extent the deposition testimony is contradicted by Ms. Benavide[z]' declaration in opposition to the instant motion, the Court must defer to the deposition testimony. *D'Amico v. Board of Medical Examiners* (1974), 11 Cal.3d 1, 22 [112 Cal.Rptr. 786, 520 P.2d 10]."

## DISCUSSION

### A. *Standard of Review*

■ Because a summary judgment motion raises only questions of law, we review the supporting and opposing papers independently to determine whether there is a triable issue as to any material fact. (Code Civ. Proc., § 437c, subd. (c); *AARTS Productions, Inc.* v. *Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1064 [225 Cal.Rptr. 203].) In doing so, we apply the same analysis required of the trial court. "First, we identify the issues framed by the pleadings . . . . [¶] Secondly, we determine whether the moving party's showing has established facts which negate the opponent's claim and justify a judgment in movant's favor. . . . [¶] . . . [T]he third and final step is to determine whether the opposition demonstrates the existence of a triable, material factual issue. [Citation.]" (*Id.* at pp. 1064-1065.) Where there is sufficient legal ground to support the granting of the motion, the order will be upheld regardless of the grounds relied upon by the trial court. (*Troche* v. *Daley* (1990) 217 Cal.App.3d 403, 407 [266 Cal.Rptr. 34].)

### B. *Special Relationship*

Plaintiffs' first and third causes of action for negligence are premised upon the police department's failure to protect them from the final attack by Cortez. In granting summary judgment for the City/Police defendants, the trial court found that, as a matter of law, the police did not have a duty to plaintiffs under the circumstances of this case.

■ The existence of a duty is a question of law. (*Dutton* v. *City of Pacifica* (1995) 35 Cal.App.4th 1171, 1175 [41 Cal.Rptr.2d 816].) As a general rule, a person who has not created a peril has no duty to come to the aid of another "no matter how great the danger in which the other is placed, or how easily he could be rescued, unless there is some relationship between them which gives rise to a duty to act. [Citations.]" (6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 858, pp. 220-221, italics omitted.) This rule applies to police officers as well as to other citizens: The police owe duties

of care only to the public at large and, except where they enter into a "special relationship," have no duty to offer affirmative assistance to anyone in particular. (*Williams* v. *State of California* (1983) 34 Cal.3d 18, 23-24 & fn. 3 [192 Cal.Rptr. 233, 664 P.2d 137].)

Plaintiff contends she produced evidence that a "special relationship" was created between her, her son, and the officers, and that therefore the trial court erred in granting summary judgment on the negligence causes of action. The evidence of a special relationship was set forth, she asserts, (1) in her declaration in opposition to the summary judgment motion, (2) in her police procedures expert's declaration, and (3) in her neighbor's deposition. We shall examine plaintiff's declaration first and then the two remaining items of evidence.

### (1) *Plaintiff's Declaration*

As noted earlier, plaintiff made the following statements in her declaration in opposition to summary judgment, which she contends establish that a special relationship was created: (1) "When Officer Lloyd and Sergeant Ross first arrived on the scene on December 12, 1993, Officer Lloyd announced, 'Don't worry, we're here!' or very similar words to that effect. I understood this as a statement that the officers had taken control of the scene and that they would protect me and my son Joey";[3] and (2) "During the interview by Officer Lloyd and Sergeant Ross on the morning of December 12, 1993, I *did* ask whether I could be taken to a shelter. The officers did not say 'yes' or 'no'; in fact, they did not respond to my inquiry in any manner."

In analyzing these statements, we are constrained by the well settled rule that "[a] party cannot create an issue of fact by a declaration which contradicts his prior [discovery responses]. [Citation.] In determining whether any triable issue of material fact exists, the trial court may, in its discretion, give great weight to admissions made in deposition and disregard contradictory and self-serving affidavits of the party." (*Preach* v. *Monter Rainbow* (1993) 12 Cal.App.4th 1441, 1451 [16 Cal.Rptr.2d 320].)

---

[3]Plaintiff's argument that a special relationship was created is predicated, in large part, on this statement. In her brief on appeal, she states: "the officers had given implied assurances of protection by taking control of the situation with the reassuring announcement 'Don't worry, we're here!' " Plaintiff cites numerous cases, including *Williams* v. *State of California, supra,* 34 Cal.3d 18, 24, and *Morgan* v. *County of Yuba* (1964) 230 Cal.App.2d 938 [41 Cal.Rptr. 508], for the proposition that police officers may create a special relationship with an individual where the officers make express promises of protection that are relied upon. The relevance of these cases depends entirely, however, upon whether the officers made any such assurances of protection. In other words, it depends on whether this evidence submitted in opposition to the summary judgment motion may be considered.

This is because, as the California Supreme Court explained in *D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1 [112 Cal.Rptr. 786, 520 P.2d 10], " 'Where . . . there is a clear and unequivocal admission by the plaintiff . . . in his deposition . . . [the trial court is] forced to conclude there is no substantial evidence of the existence of a triable issue of fact [notwithstanding a contradictory declaration in opposition to summary judgment].' . . . [¶] . . . [A]dmissions against interest have a very high credibility value. This is especially true when, as in this case, the admission is obtained not in the normal course of human activities and affairs but in the context of an established pretrial procedure whose purpose is to elicit facts. Accordingly, when such an admission becomes relevant to the determination, on motion for summary judgment, of whether or not there exist triable issues of fact (as opposed to legal issues) between the parties, it is entitled to and should receive a kind of deference not normally accorded evidentiary allegations in affidavits." (*Id.* at pp. 21-22, italics omitted; see also *Barton* v. *Elexsys Internat., Inc.* (1998) 62 Cal.App.4th 1182, 1191 [73 Cal.Rptr.2d 212] ["To the extent these descriptions directly contradict his discovery responses, they must be disregarded."]; *Visueta* v. *General Motors Corp.* (1991) 234 Cal.App.3d 1609, 1613 [286 Cal.Rptr. 402] ["Admissions or concessions made during the course of discovery govern and control over contrary declarations lodged at a hearing on a motion for summary judgment."]; *Thompson* v. *Williams* (1989) 211 Cal.App.3d 566, 573 [259 Cal.Rptr. 518] ["[A] party cannot rely on contradictions in his own testimony to create a triable issue of fact."].)

 With these rules in mind, we examine the two statements plaintiff made in her declaration. Her statement that she "*did* ask whether [she] could be taken to a shelter" directly contradicts her repeated testimony at her deposition that she did not "tell the police officers that [she] wanted to leave the apartment . . . ." Plaintiff relies heavily on this statement in her brief on appeal. She contends that her request "trigger[ed] a duty of assistance under the internal police department regulations, which the officers failed to fulfill." The statement, however, flies in the face of her unequivocal testimony during her deposition, during which she admitted that she *did* not tell the officers she wanted to leave: "Q. Did you tell them that you wanted to leave the apartment? [¶] A. No, I was throwing up most of the time. I could hardly talk. . . . [¶] Q. And you did not tell the police officers that you wanted to leave the apartment; is that correct? [¶] A. No. [¶] Q. Pardon me? [¶] A. No. [¶] Q. No, meaning? [¶] A. *I didn't say anything.*" (Italics added.) Plaintiff's statement that she told the officers she wanted to go to a shelter and that they ignored her directly and unequivocally contradicts her testimony that she did not "say anything" and that she did not tell them she wanted to leave her apartment. Under the case law, her latter statement must be disregarded.

Similarly, plaintiff's statement in her declaration that the officers told her " 'Don't worry, we're here!' " which led her to believe that they would remain to "protect [her] and [her] son" is belied by her deposition testimony. There she made it clear that she knew that both officers were leaving her and were not remaining to protect her and her son. Ross left, she explained, because the incident "was over"; Lloyd left to see if Cortez was at his mother's house and "to look for [her] car." Knowing that both of the officers were leaving and would no longer be there to protect her, she asked them what she should do if Cortez returned. She was told to call 911. Any reliance on the officer's statement, "Don't worry, we're here!" surely could only apply when the officers were "here" (i.e., at plaintiff's house), not when they had left the scene to take on other police assignments (Ross) or to go to Cortez's mother's house (Lloyd) some seven or eight minutes away from plaintiff's apartment.[4]

Plaintiff relies upon two cases which held that declarations that contradict earlier discovery responses may sometimes be considered. However, both cases are clearly distinguishable. *Price* v. *Wells Fargo Bank* (1989) 213 Cal.App.3d 465 [261 Cal.Rptr. 735], which cited with approval the *D'Amico* rule, involved admissions which were "circumstantial," "tacit . . . or fragmentary and equivocal concessions." (*Id.* at pp. 480, 482.) Here, in contrast, the admissions in the earlier deposition were not equivocal—they directly and unequivocally contradicted the later statements. *Niederer* v. *Ferreira* (1987) 189 Cal.App.3d 1485 [234 Cal.Rptr. 779] involved a plaintiff's misunderstanding of a legal term of art (an "assignment"). Notwithstanding that the plaintiff thought she did not have an assignment, "it is clear defendant treated the note as assigned to plaintiff and accordingly made payments on the note, to her, over a period of time. He presented no evidence he ever challenged the genuineness of the assignment or plaintiff's right to receive payments thereunder." (*Id.* at pp. 1503-1504.) Thus, the contradiction between plaintiff's deposition and later declaration was explained; she now understood that the payments had been made because the note was assigned to her.

The contradiction in the instant case cannot be explained based on plaintiff's lack of understanding of a legal term of art. Either she did not say anything or she asked to go to a shelter; either she thought the officers were

---

[4]Further, when asked in her deposition what the officers did and said when they arrived, she never mentioned Lloyd's alleged statement that she need not worry because police were there. When asked "[W]hen the police came, what did they—what happened?" plaintiff answered, "I guess they asked me what happened." Later she was asked "[W]hat did they tell you?" She answered, "[o]ne of the police officers yelled at Joey because Joey went and got a stick . . . to protect me . . . ." These responses are arguably inconsistent with her current declaration as well, although they are not unequivocally so.

staying to protect her or she thought they were leaving. The responses are contradictory and mutually exclusive. Under these circumstances, the trial court did not abuse its discretion in ruling that the contradictory statements in plaintiff's declaration must be disregarded, and therefore that those statements failed to raise a triable issue of fact.

(2) *Plaintiff's Neighbor's Deposition Testimony and Her Police Procedures Expert's Declaration*

Plaintiff also contends that a special relationship was created when the officers engaged in affirmative acts that increased the risk to plaintiff and her son. Specifically, she argues that the officers created a peril for her and Joey by using them as "bait" to lure Cortez back to the apartment. In support of this theory, she introduced the declaration of a police procedures expert and the deposition testimony of her neighbor.

It is true that under certain circumstances, a special relationship may be created when police engage in affirmative acts that increase the risk of harm to others. In *Mann* v. *State of California* (1977) 70 Cal.App.3d 773 [139 Cal.Rptr. 82], a highway patrol officer saw two stranded cars in a speed-change lane of a freeway and pulled up behind them. He stood in the lane and did not instruct anyone to get back into his or her car. Later a tow truck arrived, and the officer left without telling anyone, and without waiting for the tow truck to assume the protective rearward position with a flashing light. Furthermore, the officer did not put any flares on the freeway. Shortly after he left, another car driven by a partially blind driver sideswiped one of the stalled cars and struck the plaintiff. The Court of Appeal reversed the trial judge's direct verdict for the state, noting that, "While no special relationship may exist between members of the California Highway Patrol and the motoring public generally, or between the Patrol and stranded motorists generally, once a state traffic officer has chosen to investigate the plight of specific persons on a freeway and informed himself of the foreseeable danger to them from passing traffic, a special relationship requiring him to protect them by readily available means arises and liability may attach if the officer's limited duty to protect these people under these special circumstances is not performed." (*Id.* at p. 780.)

Plaintiff contends that her situation is comparable to the situation in *Mann*. She asserts that the police informed her not to worry because they were there, and then they left leaving her and Joey as "bait" to lure Cortez back to the apartment. To support this theory, she attached in her opposition to defendant's motion for summary judgment the deposition testimony of her neighbor, Jeffrey Scott, and the declaration of Frank Saunders, a police procedures expert.

Plaintiff's neighbor Jeffrey Scott was asked the following in his deposition: "Q. What about this incident made you think that they were using Mrs. Benavidez as bait? [¶] A. Well, they didn't know where this guy was. They looked around for him, they asked me if I had seen him. And I felt like they could have taken her and the boy out of the house, and he still would have come back. [¶] By her and the boy being there, he came back and stayed, so I felt like they used him—or they used these people as bait for this guy to come back, because more than likely he was watching—because it's very easy to do—he was watching when they came back and when they left the first time." He also stated that he had seen a lot of domestic violence in his neighborhood and that he had observed that the perpetrator often leaves and then comes back.

Plaintiff also submitted the declaration of Frank Saunders, a retired field training police officer who has testified as an expert in police procedures in over 300 cases. Saunders concluded that defendants were "grossly negligent and [their conduct] fell well below the reasonable standard of care for police officers in the San Jose community . . . ." The officers "could and should have" taken plaintiffs to an emergency room or alternatively to a shelter to remove them from the zone of danger. He believed the officers "negligently increased the peril" to plaintiff and her son by stating "Don't worry, we're here!" which "suggested [to plaintiffs] there was no imminent threat . . . ." Furthermore, it appeared to Saunders, based on neighbor Scott's deposition, that the officers left the plaintiffs as "bait" to lure Cortez back to the apartment. Saunders opined that "a 'special relationship' was clearly established between plaintiffs . . . from and after the time Officer Lloyd and Sergeant Ross responded to plaintiffs' original 911 call for emergency assistance."

Although defendants interposed evidentiary objections to Saunders's declaration, the record does not show that the trial court ever formally ruled on any of the objections. Accordingly, all the evidence "submitted was available for the trial court's consideration (Code Civ. Proc., § 437c, subd. (c)) and is available for ours." (*Hagen* v. *Hickenbottom* (1995) 41 Cal.App.4th 168, 175 [48 Cal.Rptr.2d 197].) ██ Nevertheless, "it is presumed on appeal [from a summary judgment] that a judge has not relied on irrelevant or incompetent evidence." (*Biljac Associates* v. *First Interstate Bank* (1990) 218 Cal.App.3d 1410, 1420 [267 Cal.Rptr. 819].)

██ Here some of Saunders's legal conclusions are based on incompetent evidence: (1) plaintiff's declaration that contradicts her earlier deposition testimony and (2) the speculations of a neighbor who had opinions on how the police could have performed their job better. Furthermore, the

ultimate issue—whether the police owed a duty to plaintiffs—is a question of law for the trial court. (*Dutton* v. *City of Pacifica, supra*, 35 Cal.App.4th at p. 1175.) Courts must be cautious where an expert offers legal conclusions as to ultimate facts in the guise of an expert opinion. (*Martinez* v. *County of Los Angeles* (1996) 47 Cal.App.4th 334, 348 [54 Cal.Rptr.2d 772].)

In *Martinez*, a mother and daughter brought a wrongful death action against the sheriff's office for shooting and killing the decedent, who deputies believed had been brandishing a knife in public. The family of the decedent submitted a declaration of the same Frank Saunders in their opposition to the county's motion for summary judgment. In that case, Saunders opined that the officers were " 'totally premature' " in shooting decedent, that the officers' conduct " 'fell to a level of gross negligence . . . ,' " and that the county's failure to train the officers " 'rises to a level of deliberate indifference to the misuse of deadly force . . . .' " In disregarding Saunders's declaration and upholding summary judgment, the court stated "[C]ourts have been highly critical . . . when an expert offers legal conclusions as to ultimate facts in the guise of an expert opinion. [Citations.] Saunders's declaration falls into the latter category by inappropriately drawing legal conclusions concerning such matters as the objective reasonableness of the deputies' conduct and the county defendants' 'deliberate indifference' to misuse of force. [Citation.] To the extent it does so, we reject that declaration." (*Martinez* v. *County of Los Angeles, supra*, 47 Cal.App.4th at pp. 347-348.)

In the instant case, the same result is called for. To the extent Saunders's declaration draws legal conclusions such as whether a special relationship was created when the officers replied to the 911 call, whether the officers increased the risk to plaintiffs, and whether the officers used plaintiffs as "bait," we reject the declaration. Thus, unlike the situation in *Mann* v. *State of California, supra*, 70 Cal.App.3d 773, there was no competent evidence presented that the affirmative acts of Officers Lloyd and Ross increased the risk of harm to plaintiff or Joey.

■ Plaintiff also contends that defendants had an independent duty of care toward Joey under the special relationship doctrine. She argues this duty arose out of his status as a separate victim of Cortez's assaults and threats, his age and size, his inability to protect himself, and his mother's inability to protect him due to her injuries. As authority for the proposition that a separate special relationship existed with Joey, separate and distinct from any relationship with his mother, plaintiff cites the following: "The determination whether a party owes a duty to one in the plaintiff's circumstances·is informed by 'the body of statutes and judicial precedents which color the

parties' relationship' [Citation.] [A] statute[] that 'color[s]' [Joey's] relationship with Officers Ross and Lloyd is Welfare & Institutions Code § 300(b) which gives the juvenile court jurisdiction over children when 'there is substantial risk that the minor will suffer[] serious physical harm or illness[] as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the minor.' [Citation.]"

In support of the proposition that Welfare and Institutions Code section 300 creates a duty on the part of the police officers to remove children from the home in situations such as occurred here, plaintiff cites *In re Basilio T.* (1992) 4 Cal.App.4th 155 [5 Cal.Rptr.2d 450].[5] There, the court found there was not substantial evidence of substantial danger to the physical health of a minor to uphold a finding under Welfare and Institutions Code section 361, former subdivision (b)(1), under a clear and convincing standard. This case does not support plaintiff's contention that Welfare and Institutions Code section 300 creates a duty on the part of police officers to remove children from the home. Welfare and Institutions Code section 300, which deals with the jurisdiction of the juvenile court, not with the duties of police officers, provided in 1997, in pertinent part, "Any minor who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court: [¶] . . . [¶] (b) The minor has suffered, or there is a substantial risk that the minor will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the minor, or the willful or negligent failure of the minor's parent or guardian to adequately supervise or protect the minor from the conduct of the custodian with whom the minor has been left, or by the willful or negligent failure of the parent or guardian to provide the minor with adequate food, clothing, shelter, or medical treatment, or by the inability of the parent or guardian to provide regular care for the minor . . . ."

Plaintiff also relies on statements made by Officers Lloyd and Ross that it was their practice and the department's policy, in circumstances where they believed children to be endangered, to remove the children from the home. In this case, however, neither officer believed that that threshold had been met.

Plaintiff also argues that under the circumstances of this case, the officers had a duty to take steps specifically designed to protect Joey from further trauma. A special relationship arises, she claims, "when the conduct of a police officer, in a situation of dependency, results in detrimental reliance on him for protection." (*Williams* v. *State of California, supra,* 34 Cal.3d at p.

---

[5]We note that plaintiff did not raise this theory of officer liability in the trial court.

25, italics omitted, discussing *Mann* v. *State of California, supra,* 70 Cal.App.3d 773.) However, the California Supreme Court pointed out that, "[I]n *Mann,* the officers' *conduct contributed to, increased, and changed the risk* which would have otherwise existed." (*Williams* v. *State of California, supra,* 34 Cal. 3d at p. 25, italics added.) *Mann,* as we discussed at page 863 of this opinion, was the case in which a highway patrol officer left stranded motorists without telling them, without putting flares on the road, and without waiting for the tow truck to arrive.

The evidence presented in opposition to the summary judgment motion simply did not support the proposition that the officers' conduct here contributed to, increased, and changed the risk which already existed vis-à-vis Cortez. In arguing that Joey detrimentally relied on the officers the same way the motorists relied on the highway patrol officer in *Mann,* plaintiff asserts that the officers "further increased [Joey's] dependency [upon them] by disarming him (and mocking his attempt to protect himself and his mother), and by advising that nothing more than another 911 call was necessary for protection against Cortez." She maintains that "[t]his conclusion is confirmed by other appellate decisions specifically addressing the question of special relationships involving children." However, as we explain, both cases she claims "confirm this conclusion" are inapposite.

In *Pamela L.* v. *Farmer* (1980) 112 Cal.App.3d 206 [169 Cal.Rptr. 282], three minor girls were sexually molested by a man while they were playing in his backyard swimming pool. The man's wife knew of her husband's prior history of molesting women and children. Nevertheless, she allegedly encouraged and invited the three young girls to use the swimming pool at her house, and she told the girls' parents that it was safe for their children to play at her house while she was at work and her husband was home. The court noted, "In this case plaintiffs were dependent upon respondent because plaintiffs are children. Being of tender years they were particularly vulnerable to this sort of misconduct and not fully able to protect themselves against it. [Citation.] In inviting the children to her home, respondent assumed that special relationship. Respondent recognized that special duty and relationship when she assured plaintiffs' parents it would be safe for them to play at her house." (*Id.* at pp. 211-212.) The court found the "special relationship" justified the imposition of liability if the allegations of the complaint were proved true at trial. The *Pamela L.* case, unlike the case at bar, is a classic example of conduct which contributes to, increases, and changes the risk of harm that would have otherwise existed.

The other case plaintiff relies on is *Ronald S.* v. *County of San Diego* (1993) 16 Cal.App.4th 887 [20 Cal.Rptr.2d 418], which is also inapposite. In

*Ronald S.*, the minor's parents died, and he became a dependent of the court. The county eventually placed him in an adoptive home, and it gave control over his inheritance from his parents' estate to the adoptive parents. The minor later sued the county, claiming he had been abused by his adopted father, who had converted his funds, and that the county was negligent in transferring the funds to them. The court found a special relationship was created during that period before Ronald was adopted because, at that time, Ronald was "wholly dependent upon the good offices of the County to supervise his placement" and "from both a practical and legal point of view, entirely within the County's control." (*Id.* at p. 895 and fn. 4.) After his adoption, however, the county was no longer in a special relationship with Ronald. The court remanded for a new trial, with directions that the only theory of negligence to be presented to the jury would be the question of the county's negligence in administration of the minor's funds. This case also is distinguishable. The county's act in handing over the funds to the adoptive family contributed to, increased and changed the risk of loss of those funds compared with if the funds had been left in the county's administration account.

We conclude that none of the reasons cited militate in favor of finding a special relationship with Joey, separate and distinct from any duties owed to his mother. None of the evidence presented in opposition to the summary judgment motion created a triable issue of fact that a special relationship was created between the police and plaintiffs. As we have said earlier, without a special relationship, the police owed no duty to plaintiffs, and without a duty, no negligence cause of action can be stated. The trial court did not err in granting summary judgment.

### DISPOSITION

The judgment is affirmed.

Premo, J., and Elia, J., concurred.

A petition for a rehearing was denied May 25, 1999, and the opinion was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied July 21, 1999.