**Eugene Oliver SWAN, Plaintiff,**

v.

**UNITED STATES of America, et al., Defendants.**

**No. C 99–5401 MJJ.**

United States District Court, N.D. California.

March 21, 2001.

1177

---

C. Brooks Cutter, Friedman, Collard, Cutter & Panneton, Sacramento, CA, for Plaintiff.

Neal A. Rubin, U.S. Attorney's Office, San Jose, CA, for Defendants.

## ORDER GRANTING DEFENDANTS UNITED STATES OF AMERICA AND LINDA YOUNG–MILLER, PH.D.'s MOTION FOR SUMMARY JUDGMENT

JENKINS, District Judge.

Before the Court is defendants United States of America and Linda Young–Miller, Ph.D.'s ("Young–Miller") motion for summary judgment. The defendants contend that plaintiff Eugene Oliver Swan's ("Swan") claim for violation of the Eighth Amendment to the United States Constitution against Young–Miller fails because she is shielded from liability by the doctrine of qualified immunity, and that

Swan's negligence claim, brought under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 et seq., against the United States fails because Young–Miller did not breach any standard of care.[1] For the reasons set forth below, the Court GRANTS defendants' motion.

## FACTUAL BACKGROUND

Swan is an inmate serving a sentence for bank robbery and escape from federal custody. His claims in this action arise from an incident that occurred on December 24, 1998 while he was incarcerated at the Federal Corrections Institute in Dublin, California ("FCI Dublin"). On that date, Swan was attacked by another inmate and suffered an injury which required the surgical removal of his left eye. Swan contends that prior to the attack he provided information to prison officials, specifically Young–Miller, which should have put the defendants on notice of an impending assault. Their subsequent failure to prevent the attack, Swan claims, violated his rights and thereby renders the defendants responsible for his injury.

Young–Miller is a staff psychologist at FCI Dublin who provided counseling to Swan from September 1997 through December 1997 and again from June 1998 through February 1999. This counseling involved crisis prevention through individual and group psychotherapy, and focused on the prevention of self-harm and suicide by Swan and on the management of his symptoms of psychosis and depression. According to Swan, he and Young–Miller had developed an open and honest relationship, and thus, during his counseling sessions with Young–Miller, he felt com-

---

1. Swan's First Amended Complaint brings numerous claims against a multitude of defendants. However, before this motion for summary judgment was filed as well as during the pendency of the motion, Swan dis- missed all defendants other than the United States and Young–Miller and dismissed all causes of action except those based on the Eighth Amendment and the FTCA.

fortable discussing his mental and emotional well-being, his prior sexual abuse and intimidation as an inmate, and his history of physical abuse. On one occasion, Young–Miller employed her knowledge of Swan's prior experiences to avert his transfer from FCI Dublin to a facility in Lompoc, California. Having been told by Swan that he had been sexually assaulted by another inmate during his incarceration at the Lompoc facility, Young–Miller requested that Swan not be designated for transfer.

On December 3, 1998, Swan requested an emergency session with Young–Miller. At that session, Swan informed Young–Miller that he had been confronted and intimidated by a group of inmates. The confrontation involved inmate Raymond Chow's ("Chow") demand that Swan allow Chow's cellmate to move into Swan's cell. When Swan told Chow that he did not want a cellmate, Chow threatened Swan, telling him that he "had better take this guy out of his cell, because if [he] didn't, [Swan] would be disrespecting him." *See* Swan Deposition ("Depo."), 45:19–25; 46:1–3. Swan related to Young–Miller that he had enlisted the assistance of a large friend in order to back down the threatening inmates. He also explained to Young–Miller that he "was afraid like when [he] was in reform school, when [he] had been physically and sexually abused,

and that [he] had those same type of fears of happening here." *Id.* at 105:14–17. Swan further testified that he specifically remembers saying that he needed help; according to Swan, Young–Miller "asked me what should I do, or what do you want me to do," and he said "I don't know[,] I just need help." *See id.* at 105:3–11.[2]

At her deposition, Young–Miller conceded that she "guess[ed] it did occur to [her] as a possibility" that the group of inmates might hurt Swan, but that "once entertaining that thought, [she] did not feel concerned that they would." *See* Young–Miller Depo., 27:8–12. Had Young–Miller believed that violence against Swan was likely, she could have pursued several measures intended to protect inmates, including placing Swan in protective custody, moving Swan to another unit at FCI Dublin, or moving one of the threatening inmates away from Swan. Alternatively, she could have kept Swan's December 3, 1998 disclosures confidential, but informed Swan of the protective measures that were potentially available to him. Young–Miller did not follow either of these courses of action. She "didn't seriously think [Swan] was in physical danger," *see* Young–Miller Depo., 28:2–3, but instead concluded that the intimidation from the group of inmates had caused Swan to relive childhood traumas. *See* Young–Miller Declaration ("Decl."), ¶ 7.

---

2. Swan's purported request for help was disclosed in the context of the following deposition testimony:

Q: Do you remember Dr. Young–Miller's response?

A: She asked me if what had happened, and I told her, and she responded by saying do you want me to do something.

Q: Do you have a specific—you're squinting, so do you have a specific memory of her saying that to you?

A: She asked me what I should do, or what do you want me to do. I said I don't know. I just need help.

Q: Do you have a specific memory of saying that you needed help?

A: Yes.

Q: And what did she respond?

A: She asked me what she wanted me do, and I just said I don't know.

Q: What happened after that, after you told her you didn't know what she should do?

A: I just—I continued to tell her that I was afraid like when I was in reform school, when I had been physically and sexually abused, and that I had those same types of fears of happening here.

She therefore did not inform Swan of the available protective measures, did not tell anyone about his confrontation with the other inmates, and did not take any other action in response to Swan's December 3, 1998 disclosures.

Various facts purportedly support Young–Miller's conclusion that Swan was not in immediate danger, as well as her decision to keep the session confidential. At some point in December 1998, Swan told Young–Miller that inmates spoke in pejorative terms about inmates like Swan who received treatment from the FCI Dublin psychology staff, yet he never stated a belief that those insults would escalate into violence against him. Furthermore, during the December 3, 1998 counseling session, Swan did not expressly ask for any kind of protection from other inmates. He did not ask Young–Miller to place him in protective custody, he did not ask for a change in his housing situation, such as being moved to another unit at FCI Dublin, nor did he ask that another inmate be moved away from him. Swan also failed to make any of the above-mentioned requests to the Administrator of FCI Dublin who was in the same room as Swan and Young–Miller during the December 3, 1998 session (but who was not privy to their conversation). Swan's statements following the December 3, 1998 session further indicate that his fears of being harmed had subsided and that he wished to keep confidential his disclosures regarding his confrontation with the threatening inmates. During his regularly scheduled appointment with Young–Miller on December 8, 1998, Swan indicated that he did not want her to disclose such information for fear of being labeled a "snitch," and asked Young–Miller: "You didn't tell anyone, did you?" *See* Young–Miller Decl., ¶ 8. Furthermore, he diagnosed himself as being "paranoid" and stated that his fears regarding the confrontation could have been misplaced.

*See id.* At his December 16, 1998 and December 21, 1998 sessions with Young–Miller, Swan did not report any fear of danger or any intimidation from another inmate, nor did he request that any protective action be taken by the FCI Dublin staff.

## LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is appropriate if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the initial burden of proving that there is no genuine issue of material fact. That burden may be discharged by showing that there is an absence of evidence to support the non-moving party's case. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). To withstand summary judgment, the opposing party must set forth, by affidavit or other admissible evidence, specific facts showing that there is a genuine issue of material fact in dispute. *See* Fed.R.Civ.P. 56(e). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, "the moving party is entitled to a judgment as a matter of law." *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. The Court does not make credibility determinations with respect to evidence offered, and is required to draw all inferences in the light most favorable to the non-moving party. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630–31 (9th Cir.1987) (citing *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). Summary judgment is therefore not appropriate "where contradictory inferences may reasonably be drawn from undisputed evidentiary facts." *Hollingsworth Solderless Terminal Co. v. Turley*, 622 F.2d 1324, 1335 (9th Cir.1980).

## ANALYSIS

### I. Young–Millers's Qualified Immunity from Swan's Eighth Amendment Claim

■ The defense of qualified immunity protects "government officials ... from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). This rule " 'provides ample protection to all but the plainly incompetent or those who knowingly violate the law.' " *Burns v. Reed*, 500 U.S. 478, 494–95, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)). Therefore, regardless of whether or not a constitutional violation occurred, the official should prevail if the right asserted by the plaintiff was not clearly established or the official could have reasonably believed that his or her particular conduct was lawful. *Romero v. Kitsap County*, 931 F.2d 624, 627 (9th Cir.1991). "The entitlement is an immunity from suit rather than a mere defense to liability; ... it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985); *see also Hunter v. Bryant*, 502 U.S. 224, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (per curiam).

■ A court considering a claim of qualified immunity must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all. *See Wilson v. Layne*, 526 U.S. 603, 119 S.Ct. 1692, 1694, 143 L.Ed.2d 818 (1999); *Conn v. Gabbert*, 526 U.S. 286, 290, 119 S.Ct. 1292, 143 L.Ed.2d 399 (1999). The qualified immunity analysis then becomes a two-part test: (1) Was the law governing the official's conduct clearly established? and, (2) if so, under that law, could a reasonable official have believed his conduct was lawful? *See Act Up!/Portland v. Bagley*, 988 F.2d 868, 871–72 (9th Cir.1993). The plaintiff bears the burden of proving the existence of a "clearly established" right at the time of the allegedly impermissible conduct. *See Maraziti v. First Interstate Bank*, 953 F.2d 520, 523 (9th Cir.1992). If the plaintiff meets this burden, then the defendant bears the burden of establishing that his actions were reasonable, even if he violated the plaintiff's constitutional rights. *See Doe v. Petaluma City School Dist.*, 54 F.3d 1447, 1450 (9th Cir.1995); *Maraziti*, 953 F.2d at 523.

■ There is no dispute that Swan has alleged the deprivation of an actual constitutional right through his claim for violation of the Eighth Amendment. As a general matter, a plaintiff may seek damages for constitutional violations that cause injury to the plaintiff as a result of a federal officer's conduct. *See Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). The United States Supreme Court has further held that an inmate may name a federal officer, in an individual capacity, as a defendant in alleging an Eighth Amendment constitutional violation pursuant to *Bivens*. *See Wilson v. Seiter*, 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991); *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

■ Having established that Swan alleges a valid cause of action, the Court

must next determine whether the law surrounding his allegations was clearly established at the time the alleged constitutional violations occurred. *See Act Up!/Portland v. Bagley,* 988 F.2d at 873 (determination of whether the law was clearly established is an issue of law for the Court to decide). A right is clearly established when its contours are sufficiently clear so that a reasonable official would realize that what he or she is doing violates that right. *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). This does not mean that there has to be a case on point holding that the officials' exact conduct is illegal, however, "in the light of preexisting law the unlawfulness must be apparent." *Id.* at 640, 107 S.Ct. 3034.

■ In 1994, several years prior to the events at issue in this case, the United States Supreme Court established the basic standard for an alleged Eighth Amendment violation, holding that "a prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Farmer v. Brennan,* 511 U.S. 825, 828, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Whether or not a prison official acted with "deliberate indifference" is determined under a subjective, rather than objective, test wherein "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate

health or safety." *Id.* at 837, 114 S.Ct. 1970. The official must not only be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, he or she must also draw such an inference. *Id.* In light of this specific guidance from the Supreme Court, it is apparent that the relevant law was · clearly established in 1998 when Swan was attacked by another inmate.

■ Accordingly, the Court must resolve the second part of the qualified immunity test: whether the facts could support a reasonable belief that the conduct at issue was lawful.[3] In this case, the Court must decide if a reasonable official who possessed the same knowledge of the surrounding facts that Young–Miller possessed would have believed that her course of conduct was lawful under the legal standards set forth in *Farmer?* Put another way, could Young–Miller have reasonably believed that her failure to take affirmative steps to protect Swan was lawful under *Farmer's* deliberate indifference standard?

■ A plaintiff may make the factual showing that a prison official had the requisite knowledge of a substantial risk "in the usual ways, including inference from circumstantial evidence." *Farmer,* 511 U.S. at 842, 114 S.Ct. 1970 (internal citations omitted). Thus, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* Neverthe-

---

**3.** The Ninth Circuit has recognized that a "tension" may exist between the qualified immunity standard's emphasis on objective reasonableness and claims in which the clearly established law at issue contains a subjective element, such as in this case where the deliberate indifference standard governs Swan's alleged Eighth Amendment violation. *See Branch v. Tunnell,* 937 F.2d 1382, 1385 (9th Cir.1991) (*"Branch I "*), *reaffirmed in Branch v. Tunnell,* 14 F.3d 449 (9th Cir.1994) (cita-

tions and footnote omitted). However, in *Branch I,* the Ninth Circuit approvingly noted that a number of circuits have held that courts are not precluded from considering subjective factors (unrelated to knowledge of the law) in assessing a defendant's entitlement to qualified immunity, and, to account for any resulting "tension," adopted a heightened pleading standard for constitutional torts having subjective elements. *See id.* at 1385–86

less, "the obviousness of a risk is not conclusive and a prison official may show that the obvious escaped him." *Id.* at 843 n. 8, 114 S.Ct. 1970. "Prison officials charged with deliberate indifference might show, for example, that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." *Id.* at 844, 114 S.Ct. 1970. "In addition, prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844, 114 S.Ct. 1970. In any event, turning a blind eye to the relevant surrounding facts will not shield a prison official from liability. "[I]f the evidence show[s] that [a prison official] merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist (as when a prison official is aware of a high probability of facts indicating that one prisoner has planned an attack on another but resists opportunities to obtain final confirmation ...)," liability may be imposed. *Id.* at 843 n. 8, 114 S.Ct. 1970.

In this case, Young–Miller could have reasonably believed that her failure to take affirmative steps to protect Swan was lawful because a reasonable official, having the same knowledge of the surrounding facts as Young–Miller, could have believed that no excessive risk to Swan's health or safety existed under the circumstances. On December 3, 1998, Young–Miller learned of Swan's confrontation with the other inmates and heard his admission that he was afraid. This information did not surface in a vacuum; rather, Young–Miller was able to place these facts within the context of Swan's therapeutic history and the disclosures he had made to Young–Miller during their long-standing counseling relationship. Young–Miller was treating Swan for symptoms of psychosis and depression, and through this treatment, learned of Swan's history of physical abuse and his prior sexual abuse and intimidation as an inmate. Indeed, at the December 3, 1998 counseling session, Swan himself connected his fears from the threatening confrontation with his childhood experiences at reform school, where he had been physically and sexually abused. *See* Swan Depo., 105:14–17. Young–Miller reasonably concluded that the confrontation with the other inmates did not pose an actual risk that Swan would come to physical harm, but rather had caused him to relive his negative past experiences and thus request counseling from his therapist. This conclusion was later supported by Swan himself on December 8, 1998, just a few days after he first told Young–Miller of the confrontation, when he described himself as "paranoid" and explained to Young–Miller his belief that his fears could have been misplaced. *See* Young–Miller Decl., ¶ 8.

Swan's failure to request preventive measures by prison officials further indicated that there was no excessive risk to Swan's health or safety. In December 1998, prior to his attack, Swan told Young–Miller that other inmates had harassed him because he received treatment from the FCI Dublin psychology staff, yet he did not express a belief that such harassment would lead to violence or ask for protection from the harassing inmates. Likewise, Swan never asked that specific preventive measures be taken to protect him from physical harm arising from his confrontation with the threatening inmates led by Chow, despite the fact that he met with Young–Miller four times between the confrontation and the December 24, 1998 attack. Swan did state to Young–Miller

on December 3, 1998 that he needed help. However, that plea becomes somewhat ambiguous when examined in the context of the deposition testimony from which it derives. When Young–Miller asked Swan what he wanted her to do, he said he did not know, he "just need[ed] help." Young–Miller's response was to again ask Swan what he wanted her to do. Swan again said he did not know and then he proceeded to explain to Young–Miller that he was afraid like when he was in reform school. Three reasonable interpretations of this conversation are plausible. First, Swan may have intended to request that Young–Miller take some action to protect him, but he did not know what form such action should take. Second, Swan may have expressed a need for help, but when asked to specify the assistance he desired, he vacillated and became unsure as to whether he actually wanted any assistance. Third, when Swan asked for help, he may have been asking Young–Miller for psychological assistance in dealing with the childhood fears that had resurfaced as a result of the confrontation and Swan's history of sexual and physical abuse. Given the possible meanings of Swan's plea for help, a reasonable prison official could have properly concluded that Swan was not in fact requesting to be protected by prison staff, and thus, the prison official could have believed that not taking further action was lawful under the circumstances. Swan's subsequent failure to report any fear of danger or intimidation and failure to request any assistance at his December 8, 1998, December 16, 1998, or December 21, 1998 counseling sessions likely confirmed Young–Miller's conclusion that Swan did not desire protection, and, by reasonable implication, her opinion that Swan did not believe he was in physical danger.

Finally, Young–Miller's decision not to pursue protective action was motivated not by an indifference to Swan's situation, but by her desire to preserve the confidentiality of Swan's disclosures. As described in the next section of this Order, California law protects the confidentiality of communications between psychotherapists and patients. While psychologists are required to disclose information regarding dangers that patients pose *to themselves or to others,* California law does not require disclosure where the danger is posed *to the patient from a third party.* Rather, a psychologist may disclose, *but is not obligated* to disclose such information. Thus, when Swan informed Young–Miller that he had been threatened by someone else, Young–Miller was not required to breach the confidentiality of her patient-psychotherapist communications with Swan. With regard to the issue of qualified immunity, Young–Miller could have reasonably believed that her decision to maintain the confidentiality of Swan's December 1998 disclosures properly complied with the law. Moreover, Swan later confirmed that Young–Miller's decision corresponded to his expectations regarding confidentiality when, at his December 8, 1998 session, he verified that she had not told anyone about his confrontation with the other inmates by asking her, "You didn't tell anyone, did you?" *See* Young–Miller Decl., ¶ 8.

Not only was a risk to Swan not obvious in this case, the undisputed facts also demonstrate that Young–Miller, or another prison official in her shoes, could have reasonably determined that no excessive risk to Swan's health or safety existed under the circumstances. Young–Miller's assessment of the situation did not amount to deliberate indifference to Swan's predicament, nor did she know of but disregard a substantial risk that Swan would suffer serious harm. To the contrary, she considered the surrounding facts and concluded that "the risk to which the facts gave rise was insubstantial or nonexistent." *Farmer,* 511 U.S. at 844, 114 S.Ct. 1970.

The facts reveal that a reasonable prison official in Young–Miller's position would have similarly concluded that Swan's fears, while credible, did not place him in danger of serious harm.[4] Consequently, Young–Miller is entitled to qualified immunity from Swan's claim for violation of the Eighth Amendment.

## II. Federal Tort Claims Act

 The defendants also seek summary judgment in their favor on Swan's FTCA claim. According to Swan, the United States is liable under the FTCA because Young–Miller was negligent in failing to take any action after Swan told her of his confrontation with the threatening inmates. The defendants, however, contend that Young–Miller's duty as a psychotherapist to keep Swan's communications confidential excused her from disclosing information regarding the confrontation, and thus, the defendants argue that Young–Miller's actions satisfied the duty of care she owed to Swan.

The FTCA waives the sovereign immunity of the United States for claims based on the negligent or wrongful acts of United States employees. 28 U.S.C. § 1346. Under the FTCA, the government's liability is determined "in the same manner and to the same extent as a private individual in like circumstances." 28 U.S.C. § 2674; *Kangley v. United States*, 788 F.2d 533 (9th Cir.1986). Because plaintiff's accident occurred in California, this action is governed by California law. 28 U.S.C. § 1346(b); *Yanez v. United States*, 63 F.3d 870, 872 (9th Cir.1995).

 California law provides a broad rule of privilege to protect confidential communications between patient and psychotherapist. *See* Cal. Evid.Code § 1014(a). Under this privilege, psychotherapists are required to maintain the confidentiality of their communications with patients. There are, however, several exceptions to this obligation. Since the patient holds the privilege of precluding the disclosure of confidential communications, he or she may waive the privilege through his or her own disclosure of a significant part of the communication or by consenting, through words or actions, to such a disclosure by someone else. *See* Cal. Evid.Code § 912. Similarly, California law precludes psychotherapists from claiming the privilege of refusing to disclose confidential communications when their patients instruct them not to do so. *See* Cal. Evid.Code § 1014(c). California statutory and decisional law recognizes another exception to the privilege by imposing a duty on psychotherapists to disclose confidential patient communications when there is "reasonable cause to believe that the patient is in such mental or emotional condition as to be dangerous to himself or to the person or property of another and that disclosure of the communication is necessary to prevent the threatened dan-

4. Swan makes much of the fact that Young–Miller failed to take any affirmative steps to protect him. In addition to not seeking official prison action on behalf of Swan, such as protective custody or transfer, Young–Miller also declined to advise Swan of his possible options and failed to investigate the criminal and psychological background of Chow, the inmate who threatened Swan in late 1998. Nevertheless, the applicable legal standard does not require any such action where the prison official reasonably believes that no excessive risk to the inmate's health or safety exists under the surrounding circumstances. In the absence of such a risk, special protective steps are arguably unnecessary. Here, Young–Miller reasonably determined that no excessive risk was posed to Swan's physical safety, and that continued psychological counseling was the appropriate response to Swan's situation. Since a prison official could have reasonably believed that these determinations complied with the law, Young–Miller was not obligated to take any additional protective action in this case.

ger." Cal. Evid.Code § 1024; *Tarasoff v. The Regents of the Univ. of California*, 17 Cal.3d 425, 442, 131 Cal.Rptr. 14, 551 P.2d 334 (1976). As explained by the California Supreme Court, "the public policy favoring protection of the confidential character of patient-psychotherapist communications must yield to the extent to which disclosure is essential to avert danger to others." *Tarasoff*, 17 Cal.3d at 442, 131 Cal. Rptr. 14, 551 P.2d 334. Therefore, "[t]he protective privilege ends where the public peril begins." *Id.*

The situation in this case is not directly addressed by the above-described psychotherapist-patient privilege or its exceptions. Here, Swan's communications to Young–Miller did not disclose any risk that Swan would harm himself or that Swan posed a danger to others. Instead, the confrontation that Swan described to Young–Miller on December 3, 1998 involved the possibility that Swan might be harmed by a third party. California law has not imposed a duty on psychotherapists whereby they must violate the confidentiality of patient communications in order to protect a patient *from a third party.* Although a psychotherapist *may* reveal communications regarding a risk of harm to a patient from another person, they are not *obligated* to make such disclosures. *See, e.g.,* Cal. Evid.Code § 912 (patient may consent to waiver of the privilege); Cal. Evid.Code § 1014(c) (psychotherapists may not claim the privilege to refuse to disclose confidential patient communications "if he or she is otherwise instructed by a person authorized to permit disclosure"); *see also* Young–Miller Decl., ¶ 2; American Psychological Assoc., *Ethical Principles of Psychologists and Code of Conduct* § 5.05 (1992) ("Psychologists disclose confidential information without the consent of the individual *only as mandated by law, or where permitted by law* for a valid purpose, such as ... to protect the patient or client or others from harm

....") (emphasis added). Consequently, Young–Miller was under no legal duty to disclose Swan's confidential communications. *See Benavidez v. San Jose Police Dep't,* 71 Cal.App.4th 853, 859, 84 Cal. Rptr.2d 157 (1999) ("The existence of a duty is a question of law."); *Dutton v. City of Pacifica,* 35 Cal.App.4th 1171, 1175, 41 Cal.Rptr.2d 816 (1995). Moreover, since notifying prison officials of a possible risk of harm to Swan or pursuing protective measures on behalf of Swan would have necessarily involved the disclosure of Swan's counseling-session statements, Young–Miller did not breach a duty owed to Swan when she elected to forego protective action in this case. Absent a duty to disclose Swan's disclosures or take action in response to his confidential communications, there can be no negligence cause of action based on Young–Miller's conduct. *Cf. Benavidez,* 71 Cal.App.4th at 868, 84 Cal.Rptr.2d 157 ("without a duty, no negligence cause of action can be stated"). Swan's FTCA claim therefore fails as a matter of law.

## CONCLUSION

Young–Miller is entitled to qualified immunity from Swan's claim for violation of the Eighth Amendment. The undisputed facts in this case establish that Young–Miller, or another prison official possessing the same knowledge of the surrounding facts that Young–Miller possessed, could have reasonably believed that the conduct at issue was lawful under governing legal standards. Young–Miller did not exhibit deliberate indifference to a substantial risk of serious harm to Swan. Instead, she reasonably determined that no excessive risk to Swan's health or safety existed under the circumstances. Therefore, qualified immunity applies to Young–Miller and summary judgment in favor of the defendants is warranted on this cause of action.

**1186**

In addition, summary judgment is also proper with respect to Swan's claim under the FTCA. Young–Miller did not breach any duty of care owed to Swan when she maintained the confidentiality of his counseling-session communications. Since the information Young–Miller learned from Swan regarding his confrontation with the threatening inmates related to a risk of harm to Swan from a third party, and not a risk of harm from Swan to himself or to others, Young–Miller was under no legal obligation to reveal Swan's disclosures or to take any other action which would require the disclosure of Swan's confidential communications.

Therefore, defendants United States of America and Linda Young–Miller, Ph.D.'s motion for summary judgment is hereby GRANTED.

**IT IS SO ORDERED.**