Filed 5/24/13  Ayu's Global Tire v. Big O Tires CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| AYU'S GLOBAL TIRE, LLC et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> BIG O TIRES, LLC, <br> Defendant and Respondent. | B236930 <br> (Los Angeles County <br> Super. Ct. No. BC420725) |

APPEAL from a judgment of the Superior Court of Los Angeles, William F. Highberger, Judge.  Affirmed.

Hornberger Law Corporation and Nicholas W. Hornberger for Plaintiffs and Appellants.

Bryan Cave, Jonathan Solish, Glenn J. Plattner, Kristy A. Murphy and Nickolas B. Solish for Defendant and Respondent.

In the underlying action, the trial court granted summary judgment against appellants Ayele Hailemariam and Ayu's Global Tire, LLC, in their action against respondent Big O Tires, LLC (Big O). We affirm.

**RELEVANT FACTUAL AND PROCEDURAL BACKGROUND**

There are no material disputes about the following facts: Hailemariam had been employed at Kaiser Permanente in the information technology business for 16 years and had managed several large projects. He had also completed some of the requirements for a Masters of Business Administration degree. In 2005, he investigated buying a tire store franchise from Big O, after ruling out two competing tire store franchisors. In February 2008, Ayu's Global Tire entered into a franchise agreement with Big O. Hailemariam, a member of Ayu's Global Tire, guaranteed its obligations under the franchise agreement. In May 2008, appellants began operating a Big O store in Hawthorne. In August 2009, they closed the store.

On August 28, 2009, appellants initiated the underlying action against Big O and several other parties, predicated on appellants' purchase of the franchise. In November 2010, the trial court ruled that under the terms of the franchise agreement, Colorado law governed appellants' nonstatutory causes of action.

The third amended complaint (TAC), filed November 30, 2010, alleged that before appellants entered into the franchise agreement, Big O promised to provide many services and benefits to support their franchise, but withheld unfavorable information regarding the franchise's likelihood of success. The TAC further alleged that Big O's promises and omissions induced appellants to enter into the franchise agreement, and that Big O failed to honor its commitments after they did so. Although the TAC asserted numerous claims against Big O and other defendants, following a demurrer by Big O, a stipulation of the parties, and other

2

developments, the TAC was effectively reduced to asserting claims solely against Big O for declaratory relief, breach of contract, breach of the implied covenant of good faith and fair dealing, and fraud in the inducement of a franchise sale.

In February 2011, Big O filed a motion for summary judgment or adjudication on the operative causes of action in the TAC. In opposing the motion, appellants abandoned their claim for declaratory relief. Following a hearing, the trial court granted the motion, concluding that appellants' remaining claims failed for want of a triable issue of fact.[1] On September 14, 2011, judgment was entered in favor of Big O and against appellants. This appeal followed.

## DISCUSSION

Appellants contend the trial court erred in granting summary judgment with respect to their claims for breach of contract and fraud in the inducement. As explained below, we disagree.

### A. *Standard of Review*

"On appeal after a motion for summary judgment has been granted, we review the record de novo, considering all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained. [Citation.]" (*Guz v. Bechtel National Inc.* (2000) 24 Cal.4th 317, 334.) Thus, we apply "'the same three-step process required of the trial court. [Citation.]'" (*Bostrom v. County of San Bernardino* (1995) 35 Cal.App.4th 1654, 1662

---

[1] Prior to the hearing on the summary judgment motion, appellants requested leave to file a fourth amended complaint, but withdrew their request before the trial court ruled on the summary judgment motion. However, in granting summary judgment, the court considered certain amendments to the TAC that appellants had proposed, and determined that the amendments would establish no triable issues if permitted.

3

(*Bostrom*).)  The three steps are (1) identifying the issues framed by the complaint, (2) determining whether the moving party has made an adequate showing that negates the opponent's claim, and (3) determining whether the opposing party has raised a triable issue of fact.  (*Ibid*.)

Generally, "the party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; if he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact."  (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850.)  Furthermore, in moving for summary judgment, "all that the defendant need do is show that the plaintiff cannot establish at least one element of the cause of action -- for example, that the plaintiff cannot prove element X."  (*Id.* at p. 853.)

Although we independently assess the grant of summary judgment (*Lunardi v. Great-West Life Assurance Co.* (1995) 37 Cal.App.4th 807, 819), our review is subject to two constraints.  Under the summary judgment statute, we examine the evidence submitted in connection with the summary judgment motion, with the exception of evidence to which objections have been appropriately sustained. (*Mamou v. Trendwest Resorts, Inc.* (2008) 165 Cal.App.4th 686, 711; Code Civ. Proc., § 437c, subd. (c).)  Moreover, our review is governed by a fundamental principle of appellate procedure, namely, that "'[a] judgment or order of the lower court is presumed correct,'" and thus, "'error must be affirmatively shown.'" (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 664, italics omitted, quoting 3 Witkin, Cal. Procedure (1954) Appeal, § 79, pp. 2238-2239.)  Appellants thus bear the burden of establishing error on appeal, even though Big O had the burden of proving its right to summary judgment before the trial court.  (*Frank and Freedus v. Allstate Ins. Co.* (1996) 45 Cal.App.4th 461, 474.)  For this reason, our review is

4

limited to contentions adequately raised in appellants' briefs. (*Christoff v. Union Pacific Railroad Co.* (2005) 134 Cal.App.4th 118, 125-126.)

The two constraints narrow the scope of our inquiry. Here, the parties raised numerous evidentiary objections to the showing proffered by their adversary, which the trial court sustained in part and overruled in part. With the exception of the objections discussed below, appellants do not challenge these rulings on appeal, and to that extent, have forfeited any contention of error regarding the rulings.

Appellants have also forfeited contentions that summary judgment was improper with respect to their claims, to the extent they fail to challenge the trial court's determinations regarding those claims. Because appellants do not discuss their claim for breach of the implied covenant, we exclude that claim from our review. (*Wall Street Network, Ltd. v. New York Times Co.* (2008) 164 Cal.App.4th 1171, 1177; *Yu v. Signet Bank/Virginia* (1999) 69 Cal.App.4th 1377, 1398; *Reyes v. Kosha* (1998) 65 Cal.App.4th 451, 466, fn. 6.) Our review is further limited by the narrow scope of appellants' contentions regarding their claims for fraud in the inducement and breach of contract. Although those claims were predicated on numerous specific allegations of misconduct, appellants challenge summary judgment only with respect to some of those allegations. As appellants are required "to point out the triable issues [they] claim[] are present," we restrict our review to those "issues which have been adequately raised and briefed." (*Lewis v. County of Sacramento* (2001) 93 Cal.App.4th 107, 116.)

B. *Governing Principles*

At the outset, we examine the principles applicable to appellants' claims for breach of contract and fraud in the inducement, which are governed by Colorado law. The TAC alleges that Big O induced appellants to execute the franchise

5

agreement by making certain promises and suppressing facts unfavorable to the franchise's viability; the TAC further alleges that Big O breached the franchise agreement by failing to honor its promises. In seeking summary judgment, Big O contended that because the franchise agreement was fully integrated, appellants' claims failed in light of Colorado's parol evidence rule. Big O further maintained that appellants could not establish the element of reasonable reliance required for the claim for fraud in the inducement, and that Colorado's economic loss rule also barred the fraud claim. As we explain below, because Big O's challenges to the claims invoke interrelated doctrines, our inquiry initially focuses on appellants' fraud claim.[2]

Under Colorado law, the parol evidence and economic loss rules are ordinarily inapplicable to claims for fraud in the inducement. Regarding the former, the Colorado Supreme Court has explained: "Integration clauses generally permit contracting parties to limit future contractual disputes to issues relating to the reciprocal obligations expressly set forth in the executed document. [Citations.] Thus the terms of a contract intended to represent a final and complete integration of the parties' agreement are enforceable and parol evidence offered to

---

[2] Although appellants do not challenge the trial court's determination that their claims are subject to Colorado law, the parties dispute whether the court's application of the parol evidence and economic loss rules is reviewed de novo or for an abuse of discretion. In Colorado, as in California, those rules are classified as substantive principles of law. (*Magnetic Copy Servs. v. Seismic Specialists* (Colo.Ct.App. 1990) 805 P.2d 1161, 1164 [parol evidence rule]; *Colorado Nat. Bank of Denver v. Adventura Assoc.* (D.Colo. 1991) 757 F.Supp. 1167, 1168, 1172 [economic loss rule]; *Riverisland Cold Storage, Inc. v. Fresno-Madera Production Credit Assn.* (2013) 55 Cal.4th 1169, 1174 [parol evidence rule]; *JMP Securities Inc. v. Altair Nanotechnologies Inc.*, No. 11-4498 SC (N.D. Cal. 2012) 880 F.Supp.2d 1029, 1037, 1042 [economic loss rule].) Accordingly, we review the trial court's determinations regarding the rules as questions of law. (See *Juge v. County of Sacramento* (1993) 12 Cal.App.4th 59, 67 [for purposes of summary judgment, the determination of the existence of triable issues requires the application of substantive legal principles, which presents a question of law].)

6

establish the existence of prior or contemporaneous agreements is inadmissible to vary the terms of such contract. [Citation.]" (*Keller v. A.O. Smith Harvestore Products* (Colo. 1991) 819 P.2d 69, 72-73 (*Keller*).) The rule thus prevents parties from asserting breach of contract claims predicated on alleged obligations not stated in the relevant integrated agreement. (*Nelson v. Elway* (Colo. 1995) 908 P.2d 102, 108.) However, claims for fraud in the inducement are generally not subject to the rule. (*Keller*, *supra*, 819 P.2d at p. 73; see also *Bill Dreiling Motor Co. v. Shultz* (1969) 168 Colo. 59, 62 [450 P.2d 70, 71]; *Karan v. Bob Post, Inc.* (Colo.App. 1974) 521 P.2d 1276, 1277-1278.)

Similarly, Colorado's economic loss rule is ordinarily inapplicable to claims for fraud in the inducement. Under that rule, "a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach absent an independent duty of care under tort law."[3] (*Town of Alma v. Azco Constr., Inc.* (Colo. 2000) 10 P.3d 1256, 1264.) However, tort claims predicated on a noncontractual duty -- including claims for fraud in the inducement -- are "simply outside the scope of the rule." (*Id.* at p. 1263 & fn. 10.)

In view of these principles, our inquiry properly begins with an evaluation of appellants' fraud claim. If there are triable issues regarding the fraud claim, summary judgment was improper, regardless of whether the parol evidence rule may bar the breach of contract claim; moreover, the application of the economic loss rule to the fraud claim requires us to assess whether that claim relies on an independent noncontractual duty. We therefore examine Colorado law governing claims for fraud in the inducement.

---

[3]     For purposes of the rule, "[e]conomic loss is defined generally as damages other than physical harm to persons or property." (*Town of Alma v. Azco Constr., Inc.*, *supra*, 10 P.3d at p 1263.)

Under Colorado law, reasonable reliance is an essential element of such claims, regardless of whether they are predicated on an affirmative misrepresentation or concealment of a material fact. To establish fraudulent misrepresentation, a plaintiff must show that he or she relied on the misrepresentation, and was justified in doing so.[4] (*Barfield v. Hall Realty, Inc.* (Colo.App. 2010) 232 P.3d 286, 290.) Similarly, when relying on a theory of fraudulent concealment, a plaintiff must show that he or she relied on the assumption that the concealed fact did not exist (*Nielson v. Scott*, *supra*, 53 P.3d at pp. 779-780), and was justified in doing so (*Colorado Coffee Bean, LLC v. Peaberry Coffee Inc.* (Colo.App. 2010) 251 P.3d 9, 17 (*Colorado Coffee Bean*)).[5] These principles are applicable to claims for fraud in the inducement. (*Squires v. Goodwin* (D. Colo. 2011) 829 F.Supp.2d 1062, 1075 [inducement by affirmative misrepresentation]; see *Colorado Coffee Bean, supra,* 251 P.3d at pp. 15-17 [inducement by concealment].) Although the existence of reasonable reliance is ordinarily consigned to the factfinder, it may be resolved as a question of law when the relevant facts are not in dispute. (*Nielson v. Scott*, *supra*, at p. 780; *Balkind v. Telluride Mountain Title Co.* (Colo.App. 2000) 8 P.3d 581, 587 (*Balkind*); *Colorado Coffee Bean, supra,* at pp. 19-20; see *M.D.C./Wood, Inc. v. Mortimer* (Colo. 1994) 866 P.2d 1380, 1382.)

---

[4] In Colorado, "[t]he elements of fraudulent misrepresentation are: (1) a fraudulent misrepresentation of material fact; (2) the plaintiffs' reliance on the material representation; (3) the plaintiffs' right or justification in relying on the misrepresentation; and (4) reliance resulting in damages." (*Nielson v. Scott* (Colo.App. 2002) 53 P.3d 777, 779-780.)

[5] In Colorado, "[t]he elements of fraudulent concealment are: (1) concealment of a material fact that in equity and good conscience should be disclosed; (2) knowledge on the part of the party against whom the claim is asserted that such a fact is being concealed; (3) ignorance of that fact on the part of the one from whom the fact is concealed; (4) the intention that the concealment be acted upon; and (5) action on the concealment resulting in damages." (*Nielson v. Scott*, *supra*, 53 P.3d at p. 779.)

For purposes of assessing the existence of reasonable reliance, Colorado applies the doctrine of "inquiry notice." (*Sheffield Servs. Co. v. Trowbridge* (Colo.App. 2009) 211 P.3d 714, 725.) As the Colorado Supreme Court has explained, under this doctrine, "'[w]hatever is notice enough to excite attention, and put the party upon his guard, and call for inquiry, is notice of everything to which such inquiry might have led. When a person has sufficient information to lead him to a fact, he shall be deemed conversant of it. "The presumption is that, if the party affected by any fraudulent transaction or management might, with ordinary care and attention, have reasonably detected it, he reasonably had actual knowledge of it." "Concealment by mere silence is not enough. There must be some trick or contrivance intended to exclude suspicion and prevent inquiry."'" (*Cherrington v. Woods* (1955) 132 Colo. 500, 506 [290 P.2d 226, 228], quoting *Groves v. Chase* (1915) 60 Colo. 155, 161 [151 P. 914, 915].) Thus, "'[w]here the means of knowledge are at hand and equally available to both parties, and the subject of purchase is alike open to their inspection, if the purchaser does not avail himself of these means and opportunities, he will not be heard to say that he has been deceived by the vendor's representations.'" (*Ibid*., quoting *Groves v. Chase*, *supra*, 151 P. at pp. 914-915.)

Under this doctrine, a party to a contract cannot show reasonable reliance on misrepresentations regarding the contract when the party had full access to the relevant facts. In *Balkind*, a title company told the plaintiffs -- falsely -- that some real property they intended to buy was not subject to certain restrictions on its use. Before the sale occurred, the seller mentioned the restrictions to the plaintiffs, who also received title instruments describing them. (*Balkind, supra,* 8 P.3d at pp. 583-584.) After the sale, the plaintiffs asserted fraud claims based on the title company's misrepresentations. (*Id*. at p. 587.) In affirming summary judgment on

9

the claims, the appellate court concluded that the information available to the plaintiffs precluded reasonable reliance on the misrepresentations. (*Ibid*.)

For purposes of the doctrine, the terms of a fully integrated contract and related pre-contractual documents may conclusively demonstrate the absence of reasonable reliance on misrepresentations or nondisclosures that purportedly induced the contract. In *Colorado Coffee Bean*, the plaintiff bought a retail coffee shop franchise after receiving the defendant's uniform franchise offering circular (UFOC), which disclosed the gross sales of existing stores, but stated that it contained no data regarding profits and no guarantee of profitability, and advised prospective franchisees to conduct their own financial analyses. (*Colorado Coffee Bean, supra,* 251 P.3d at p. 15, 18.) The franchise agreement itself was integrated, and contained general exculpatory clauses disclaiming reliance on representations not found in the agreement. (*Id.* at pp. 20-21.) The plaintiff asserted a claim for fraudulent nondisclosure based on two theories, namely, that the franchisor had concealed (1) losses at existing stores and (2) the franchisor's own losses. (*Id*. at p. 18.)

Following a discussion of Colorado decisions and other authority, the appellate court determined that suitably "'clear and specific language'" in the UFOC or the franchise agreement could prove the absence of reasonable reliance on the purported omissions. (*Colorado Coffee Bean*, *supra*, 251 P.3d at pp. 19-20, quoting *Keller*, *supra*, 819 P.2d at pp. 73-74.) Applying this determination, the court concluded that the statements in the UFOC precluded reasonable reliance under the first theory, but that the UFOC and franchise agreement contained no terms sufficient to nullify reasonable reliance under the second theory. (*Colorado Coffee Bean*, *supra*, at pp. 19-22; see also *Universal Drilling Co. v. Camay Drilling Co*. (10th Cir. 1984) 737 F.2d 869, 872-873 (*Universal Drilling*) [fraud in the inducement claim failed, as integration and exclusion of warranty clauses in

written contract foreclosed reasonable reliance on alleged oral misrepresentations regarding oil rig's operability].)

C. *Appellants' Claims*

In assessing the propriety of summary judgment, we look first to appellants' allegations in the TAC, which frame the issues pertinent to a motion for summary judgment.[6] (*Bostrom*, *supra*, 35 Cal.App.4th at p. 1662 ["""[I]t is [the complaint's] allegations to which the motion must respond by establishing a complete defense or otherwise showing there is no factual basis for relief on any theory reasonably contemplated by the opponent's pleading. [Citations.]"""].) Here, the TAC alleged that Hailemariam, who had never owned a business, intended to buy a tire store franchise to operate after he retired. According to the TAC, before appellants executed the franchise agreement, Big O's representatives made affirmative misrepresentations and omitted material facts relevant to the agreement. This misconduct allegedly induced appellants to execute the agreement. Moreover, because many of the misrepresentations and omissions concerned contractual obligations that Big O failed to honor, Big O also breached the agreement.

The TAC alleged that upon meeting with Big O's representatives, Hailemariam disclosed that he did not know how to establish and operate a tire store. Big O told him -- falsely -- that he needed no experience to be successful in the tire business, and that his investment in a tire store was prudent. Although Big O assured him that it would offer all the training that he needed to operate his store, the training that he received was inadequate.

The TAC further alleged that Big O misrepresented and suppressed facts

---

[6] Although the TAC is the operative complaint, our discussion also reflects the allegations in the proposed fourth amended complaint, to the extent they are relevant to the grant of summary judgment (see fn. 1).

11

regarding the benefits it rendered to franchisees. Big O provided exaggerated estimates of the profits of a typical Big O store, and concealed that many of its franchisees had failed. Although Big O promised to assist franchisees, including supplying tires to them at competitive prices, it hid the fact that most of those tires were available from other suppliers at lower prices; moreover, Big O compelled franchisees to buy excessive amounts of tires. In addition, Big O falsely stated that it developed new proprietary products and services.[7]

The TAC further alleged that Big O falsely represented that it had expertise in locating and outfitting stores, and provided an exaggerated estimate of the profits that appellants could expect from their store. Big O gave Hailemariam a demographic study of a particular area, and assured him that his store would acquire five to six percent of the market share within that area. Hailemariam relied on the study in preparing his "pro forma" financial statement, which he provided to his lender and Big O. However, the pro forma "was not based on true facts and was a grossly inaccurate projection of the business . . . and the profits [he] could expect." Relying upon Big O's advice, appellants paid an excessive rent for their store, and invested heavily to remodel it in a failed effort to enhance their sales. Big O also said that it would select the correct inventory and equipment for the store, but chose an unsuitable inventory and required appellants to buy unnecessary equipment.

---

[7] The TAC also alleged Big O purported to operate an advertising program to which franchisees were obliged to pay four percent of their gross sales, but did not reveal that the program was ineffective because Big O did not require all franchisees to make their contribution. On a related matter, the TAC further alleged that Big O operated a "discriminatory" two-tiered franchise system: Business Format Franchises (BFFs) pay a six percent royalty for tires, while Product Distribution Franchises (PDFs) pay a two percent royalty, but purchase tires at a higher price. According to the TAC, the existence of the two types of franchises created competition detrimental to appellants, who operated a BFF store.

D. *Adequacy of Big O's Showing*

The initial question concerning the propriety of summary judgment is whether Big O shifted the burden to appellants to raise triable issues of fact. As explained below, Big O's showing was sufficient to do so.

1. *Big O's Evidence*

In seeking summary judgment, Big O challenged the fraud claim, arguing that its pre-agreement disclosures to appellants precluded reasonable reliance on the purported misrepresentations (if any), and that appellants had no evidence that Big O misrepresented or concealed any obligations or facts relevant to agreement. On similar grounds, Big O contended that appellants' breach of contract claim failed because appellants had no evidence that Big O breached its contractual obligations, as stated in the franchise agreement.

Big O provided declarations and other evidence supporting the following version of the underlying facts: When Hailemariam investigated buying a Big O franchise, Big O sent him several copies of its UFOC. The cover page of each UFOC stated: "Study [the UFOC] carefully. While it includes some information about your contract, don't rely on it alone to understand your contract. . . . 'If possible, show your contract and this information to an advisor, like a lawyer or accountant.'" However, Hailemariam admitted in his deposition that he neither read the UFOC carefully nor asked his lawyer to review it.

After receiving the UFOC, appellants executed the franchise agreement, which contained an integration clause. Hailemariam also executed a separate closing acknowledgment that stated: "I am not relying on any promises of Big O which are not contained in the Big O franchise agreement."

According to Big O, the purported pre-agreement misrepresentations and omissions that appellants attributed to Big O contradicted the UFOC and the

13

franchise agreement, and were unsupported by the evidence disclosed during discovery. Regarding Big O's alleged assurance that franchisees required no experience in the tire business to succeed, Big O pointed to the UFOC, which described the competitive nature of the tire market, and stated: "Your ability to compete . . . will be largely and significantly dependent on your management, sales and marketing capabilities, your involvement with your store, your financial strength, general economic conditions, geographical area and specific location." In addition, the UFOC stated: "BIG O DOES NOT GUARANTEE THE SUCCESS OR PROFITABILITY OF YOUR STORE IN ANY MANNER." Big O also submitted evidence that numerous franchisees had, in fact, been successful even though they lacked experience in the tire business.

Regarding Big O's purported offer of training that guaranteed success, Big O noted that Hailemariam testified in his deposition that he was told only that he would receive training equivalent to "[T]ire 101." Big O also submitted evidence that it has an extensive training program. Hailemariam attended a training course, and received more training "than the typical franchisee." Following the course, Big O trainers visited appellants' store to offer advice, and were prepared to give him any additional training that he requested.

Regarding Big O's alleged misrepresentations concerning the profitability of its franchisees, Big O pointed to an attachment to the UFOC, which displayed data from 211 stores confirming Big O's own estimate of the average sales per store. The UFOC further stated that Big O would substantiate the data upon request, and invited prospective franchisees to conduct an independent investigation. Big O also denied that it concealed failed franchises, noting that the UFOC enumerated transferred, cancelled, and terminated franchises for specified periods preceding the franchise agreement. In addition, Big O submitted evidence that the failed franchises were not material to Hailemariam's decision to buy a Big O franchise,

14

as he testified that knowledge of them would probably not have affected his decision to buy a Big O franchise.

Regarding Big O's purported misrepresentations concerning the provision of tires, Big O pointed out that the UFOC stated that Big O did not guarantee a specific supply of tires. Furthermore, the franchise agreement contained no provision obliging Big O to supply tires to franchisees at competitive prices, and imposed only limited obligations on Big O to assist franchisees. With respect to these matters, the agreement required Big O to provide tires "to the extent available," but permitted Big O to set the recommended prices for the tires. In executing the agreement, Hailemariam expressly acknowledged that no Big O representative had guaranteed that he would receive a "specific or sufficient amount of [p]roducts."[8]

Big O also submitted evidence that it honored its obligations of assistance to appellants. As Big O observed, Hailemariam testified in his deposition that Big O usually provided the tires that he requested, although he had to wait one day for deliveries. In addition, Big O offered evidence that it supplied appellants with competitively priced tires, adjusted tire prices to match their competitors, never required them to buy an excessive inventory, and assisted them in many ways.

Regarding Big O's purported misrepresentations regarding the development of products and services, Big O noted that Hailemariam testified in his deposition that he recalled no specific pre-agreement assurances by Big O regarding "anything new"; in addition, the franchise agreement did not oblige Big O to develop new products or services. Big O also presented evidence that it offered

---

[8]      In reply to appellants' opposition to summary judgment, Big O acknowledged that the agreement obliged it to make "'*reasonable commercial efforts* to maintain a competitive source of supply'" for the benefit of its franchises. (Italics added.) However, Big O maintained that its evidence -- which we describe below -- showed that it had complied with this provision.

many products and services, including a warranty program, and that it did in fact develop new products.[9]

Regarding Big O's purported misrepresentations concerning Hailemariam's store, Big O noted that the UFOC entrusted the "final decision" regarding a store's location to the franchisee, and disclaimed Big O's liability for that decision. According to Big O's showing, Big O representatives assisted Hailemariam as he scouted sites for a store. In 2008, after a three-year search, Hailemariam selected an established Firestone tire store in Hawthorne as the site for appellants' business. Hailemariam negotiated the purchase of the store and its equipment with the assistance of his counsel.

Big O submitted evidence that it never advised appellants that their store would be profitable, noting that Hailemariam testified in his deposition that no one told him what his gross profits were likely to be. According to Big O, it merely provided Hailemariam with some data that he used in creating his pro forma. The data included the financial information in the UFOC, as well as demographic data that Big O obtained from an unaffiliated company to assist Hailemariam in preparing his pro forma. Hailemariam also had information from Big O stores operated by Tad Kyle and from other franchises, as well as the records of the tire business at the location he had chosen. Hailemariam performed his own calculations in creating the pro forma, and also used the services of an accountant.

---

[9] Regarding Big O's purported misrepresentations concerning its advertising program, Big O noted that both the UFOC and the franchise agreement stated that Big O was permitted to refrain from requesting contributions to the program. Furthermore, regarding Big O's purported misrepresentations concerning its two-tiered franchise system, Big O observed that the UFOC described the system in detail. Big O also noted that Hailemariam, in executing the agreement, acknowledged the existence of the two-tiered system.

Regarding the store's rent, remodeling, equipment, and inventory, Big O denied that it breached its contractual obligations, and further maintained that appellants could not have reasonably relied on any pre-agreement misrepresentations or omissions. Regarding the parties' contractual obligations, the UFOC identified "'[s]ite selection and acquisition/lease'" as among the franchisee's obligations, and also stated that the cost of appropriate equipment and fixtures ranged from $100,000 to $220,000, depending on whether the franchisee bought new or used equipment. The franchise agreement required appellants to install equipment, fixtures, and signs that Big O approved; in addition, the agreement obliged Big O to assist appellants in selecting their initial inventory.

According to Big O's evidence, Hailemariam negotiated the acquisition of the store and its existing equipment. He also decided to remodel the store due to its shabby state, rejected a proposal submitted by Big O's preferred contractor, and instead selected his own contractor to perform the renovations. Big O advised him that certain modifications he proposed were unnecessary and expensive. When Big O offered Hailemariam three options concerning equipment, he rejected the option that Big O recommended, chose a more expensive option valued at $177,906, and later bought more equipment. In selecting appellants' initial tire inventory, Big O used a predictive model based on tires sales near appellants' store, and afforded them the right to return unsold tires.

### 2. *Analysis*

We conclude that Big O's showing shifted the burden to appellants to raise triable issues concerning their claims. Regarding the fraud claim, Big O challenged the existence of many of the purported pre-agreement misrepresentations and omissions on the basis of Hailemariam's own deposition testimony; in addition, Big O presented evidence that appellants could not

17

reasonably have relied on the purported pre-agreement misrepresentations and omissions (if any), in light of the disclosures in the UFOC and the provisions of the franchise agreement. Furthermore, regarding the breach of contract claim, Big O presented evidence that it complied with its obligations, as stated in the franchise agreement. Accordingly, we must examine appellants' showing to determine the propriety of summary judgment.

### E. *Fraud in the Inducement*

For the reasons discussed above (see pt. B., *ante*), our inquiry into the existence of triable issues begins with appellants' fraud claim.

#### 1. *Appellants' Showing*

In opposing summary judgment, appellants relied primarily on a declaration from Hailemariam, who stated that he became interested in buying a Big O franchise in 2005.[10] He was inexperienced, and came to trust Bill Ketchem, a Big O franchise development director, who appeared to have his best interests at heart. Ketchem misadvised Hailemariam that "there was minimal risk to the venture as

---

[10] Our summary of appellants' showing reflects the trial court's rulings on Big O's evidentiary objections, insofar as the rulings concern the evidence relevant to the fraud claim. We omit the evidence to which the trial court sustained objections, and address appellants' challenges to the rulings in our discussion of the existence of triable issues regarding the fraud claim (see pt. E.2.c., *post*). However, we include the evidence that the trial court may have barred solely under the parol evidence rule, namely, certain items of evidence regarding the existence of the misrepresentations alleged in the TAC. As explained above (see pt. B., *ante*), the parol evidence rule is applicable only to the breach of contract claim; moreover, the trial court appears to have excluded the evidence *only* for purposes of the breach of contract claim, as the court focused on whether appellants reasonably relied on the purported misrepresentations in determining that the fraud claim was subject to summary judgment. We address appellants' challenges to the rulings under the parol evidence rule in our discussion of the breach of contract claim (see pt. F.1., *post*).

18

long as [he] followed the Big O systems." In addition, Ketchem and other Big O employees, including Roger Anderson and Duane Freshnock, made false statements regarding the efficacy of Big O's training program, the profitability of its stores, its ability to supply tires, and its products and services. They did not disclose that many franchisees had complaints regarding Big O's supply and pricing of tires, and that one large franchisee had terminated his franchises due to these problems. Big O's representatives also told Hailemariam that he needed no experience to succeed, but failed to reveal a memorandum from Freshnock to Anderson that expressed his concerns regarding the high failure rate of new franchisees who lacked experience in the tire business.

According to Hailemariam, he relied on Big O to select the appropriate location for the store because he did not know how to do so. Although Hailemariam "involve[d] himself in the process, . . . Big O . . . took the lead." In addition, because he had no experience with pro formas, he also relied on data and advice from Big O in preparing his pro forma. Unknown to Hailemariam, Anderson prepared a pro forma "for internal use only" projecting that appellants' store would earn approximately $70,000 per year less in profits than stated in Hailemariam's pro forma. Nonetheless, Big O encouraged Hailemariam to seek financing based on his own pro forma.

Relying on Big O's advice, Hailemariam bought new equipment from Big O, which he later learned was unnecessary and overpriced. Big O also selected his inventory, which turned out to be inappropriate. Although Big O promised continuing assistance, its aid was "meaningless and useless." After opening the store, appellants lost money every month until August 2009, when they ended their business because their financial resources were exhausted.

In addition to Hailemariam's declaration, appellants submitted a declaration from Tad Kyle, who had owned a business that operated several Big O stores. He

19

opined that Anderson's pro forma, though "unrealistic, [was] certainly more realistic" than Hailemariam's pro forma, which he viewed as relying on excessive estimates of the store's market share, sales, and gross profits. Appellants also submitted copies of Anderson's pro forma and an e-mail dated January 29, 2008, from Freshnock to Anderson. Freshnock's e-mail enumerated several proposals intended to assist appellants' store, and then stated: "Jim . . . any other[] [measures] that you would like to recommend . . . feel free. We must come up with a plan to stop these new [o]wners with no experience from failing at such a high rate."

## 2. *No Triable Issues*

In granting summary judgment on the fraud claim, the trial court determined that appellants failed to show reasonable reliance on any pre-agreement misrepresentations or omissions. We agree.

Under the circumstances, Colorado's "inquiry notice" doctrine precludes appellants from establishing the existence of reasonable reliance. That doctrine provides that parties asserting claims for fraud in the inducement are presumed to know the terms of the contract when "a reasonably prudent man" would have read the contract before signing it. (*Clayton Brokerage Co. v. Stansfield* (D.Colo 1984) 582 F.Supp. 837, 841.) Here, Hailemariam received multiple copies of the UFOC, which became part of the franchise agreement by virtue of the integration clause. For purposes of Colorado's inquiry notice doctrine, the express warnings in the UFOC to "study [it] carefully" and seek professional advice, coupled with the large financial investment required of a franchisee, were sufficient to "'excite [Hailemariam's] attention, . . . and call for inquiry'" into the UFOC and agreement. (*Cherrington v. Woods*, *supra*, 290 P.2d at p. 228.)

20

However, Hailemariam engaged in no such inquiry, despite ample opportunity to do so. As the trial court observed, although Hailemariam negotiated with Big O for three years before executing the franchise agreement and relied on an attorney in obtaining the lease for his store, he paid little attention to the UFOC and the agreement, and never sought legal advice regarding them. Because appellants must be charged with full knowledge of the terms and disclosures in these documents, the fraud claim fails for want of triable issues regarding reasonable reliance, notwithstanding any oral misrepresentations or omissions by Big O. (*Colorado Coffee Bean*, *supra*, 251 P.3d at pp. 19-21; *Universal Drilling*, *supra*, 737 F.2d at pp. 872-873.)

Appellants challenge the grant of summary judgment regarding the fraud claim on several grounds, which we address below.

### a. *No Necessity for Experience*

Appellants contend there are triable issues whether Big O engaged in fraud by informing Hailemariam that no experience was necessary for running a Big O franchise. We disagree. Under Colorado law, "'[t]he gist of a fraudulent misrepresentation is the producing of a false impression upon the mind of the other party . . . .'" (*Corder v. Laws* (1961) 148 Colo. 310, 314 [366 P.2d 369, 372].) For this reason, a party may engage in fraud by making a true statement that nonetheless creates a false impression unless other facts are disclosed. (*Berger v. Security Pacific Information Systems, Inc.* (Colo.App. 1990) 795 P.2d 1380, 1383-1384.) As explained below, appellants failed to show the existence of fraud in connection with Big O's purported representation.

To begin, the record discloses no evidence that the purported representation to Hailemariam was, in fact, false. The formulation of the representation upon which appellants rely is found in Hailemariam's declaration, which states: "I was

21

told that I did not need experience." In seeking summary judgment, Big O submitted evidence that there were at least 41 successful Big O franchisees with no prior experience in the tire industry. Appellants offered no evidence challenging this showing.

Moreover, to the extent the representation may have suggested that appellants' store would succeed despite Hailemariam's inexperience, the record does not show that Big O failed to disclose other pertinent facts. The UFOC describes the competitive nature of the tire sales market and states: "BIG O DOES NOT GUARANTEE THE SUCCESS OR PROFITABILITY OF YOUR STORE IN ANY MANNER." Because appellants must be charged with full knowledge of this disclaimer, they cannot show that they reasonably regarded the purported representation as an assurance of success. (*Colorado Coffee Bean*, *supra*, 251 P.3d at pp. 19-21; *Universal Drilling*, *supra*, 737 F.2d at pp. 872-873.)

In an effort to show the existence of a triable issue regarding the truth of the representation, appellants direct our attention to Freshnock's January 2008 e-mail to Anderson, in which he proposed measures to assist appellants' store, asked Anderson to suggest other measures, and stated, "We must come up with a plan to stop these new [o]wners with no experience from failing at such a high rate." Although the e-mail shows that Big O was aware that the failure rate for inexperienced franchisees was high, the statement in the e-mail is consistent with the representation purportedly made to Hailemariam, and thus raises no issues material to its truth. Nor does the e-mail show that Big O concealed the failure rate among inexperienced franchisees: aside from disclaiming any guaranty of success, the UFOC disclosed those franchises that had been transferred, cancelled, and terminated, and provided contact information for franchisees who had "[l]eft the [s]ystem" (see pt. E.2.c.iv., *post*). Appellants' fraud claim thus fails, insofar as it

22

relies on Big O's alleged statement that no experience was necessary to operate a franchise.

### b. *Big O's Pro Forma*

Appellants maintain that Big O fraudulently concealed its own pro forma financial analysis of their store, which Big O relied upon in approving appellants' franchise. They argue that Big O was obliged to disclose its pro forma, and engaged in fraud by failing to do so. We reject this contention.

Under Colorado law, "[t]o succeed on a claim for fraudulent concealment or non-disclosure, a plaintiff must show that the defendant had a duty to disclose material information. [Citation.] A defendant has a duty to disclose to a plaintiff with whom he or she deals material facts that 'in equity or good conscience' should be disclosed. [Citation.]" (*Mallon Oil Co. v. Bowen/Edwards Assocs., Inc.* (Colo. 1998) 965 P.2d 105, 111.) For purposes of determining the existence of the duty, Colorado courts find guidance from section 551(2) of the Restatement Second of Torts, which enumerates several situations in which the duty arises, only one of which is potentially pertinent here.[11] (See *ibid.*)

Under section 551(2)(e) of the Restatement Second of Torts, a party to a business transaction is subject to a duty to disclose "facts basic to the transaction, if he knows [(1)] that the other is about to enter into it under a mistake as to them, and [(2)] that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts." For purposes of this rule, the phrase "facts basic to the transaction" refers to facts "assumed by the parties as a basis for the transaction itself." (Rest.2d Torts, § 551, com. j, p. 123.) Such a fact "goes to the basis, or essence, of

---

[11]     See footnote 13, *post*.

23

the transaction, and is an important part of the substance of what is bargained for or dealt with. Other facts may serve as important and persuasive inducements to enter into the transaction, but not go to its essence. These facts may be material, but they are not basic. If the parties *expressly or impliedly place the risk as to the existence of a fact on one party* . . . the other party has *no* duty of disclosure." (*Ibid*., italics added.)

Regarding Big O's pro forma, the record establishes the following facts. The UFOC states: "We do not furnish or authorize our salespersons to furnish to prospective franchisees in connection with the offer of franchises any oral or written information from which a specific level or range of actual or potential sales, costs, income or profits of a Big O store or franchise, may be ascertained, except [the general sales data specified in an appendix to the UFOC]." Furthermore, in executing the franchise agreement, Hailemariam expressly acknowledged that he had received no such assurances from any Big O employee.

Hailemariam, in creating his pro forma, performed his own calculations, and also used the services of an accountant. The pro forma projected first-year sales of approximately $1.4 million and a gross profit of 62 percent. Hailemariam submitted the draft pro forma to Anderson, who questioned whether Hailemariam's estimate of his market share was sufficiently conservative, and suggested that he lower his sales projections for the store's start-up period. In response, Hailemariam adjusted his estimate of the store's performance for the initial months of the start-up period.

After Hailemariam submitted his pro forma, Anderson independently prepared a pro forma "'for internal use only'" regarding appellants' store. The pro forma projected lower sales and gross profits for the store than Hailemariam's pro forma. In submitting appellants' application for a franchise to Big O, Anderson provided only his own pro forma to the approval committee, which awarded a

franchise to appellants. Regarding this conduct, Anderson testified in his deposition that he did not disclose his pro forma to appellants because he believed that it constituted an "earnings claim."

Relying on Hailemariam's declaration, appellants argue that Anderson was obliged to disclose the existence of Big O's pro forma, and that they reasonably took Anderson's silence regarding it to be an assurance that Hailemariam's pro forma was "realistic." Regarding these matters, Hailemariam stated that if he had been aware of Big O's pro forma, he never would have submitted his own pro forma to lenders to obtain the financing that Big O encouraged him to seek.

In our view, there are no triable issues regarding whether Big O's pro forma constituted a fact "basic to the transaction," for purposes of triggering a duty to disclose. (Rest.2d Torts, § 551, com. j, p. 123.) To begin, because the UFOC stated that no Big O employee was authorized to disclose "any oral or written information from which a specific level or range of actual or potential sales, costs, income or profits of a Big O store or franchise," the UFOC "expressly . . . place[d] the risk as to the existence of [such] fact[s]" on appellants (Rest.2d Torts, § 551, com. j, p. 123). In view of the UFOC's disclaimer, Big O had no duty to disclose its internal pro forma or its contents.[12] (*Ibid*.)

There is also no evidence that the existence of Big O's pro forma went "to the basis, or essence, of the transaction" for purposes of a duty to disclose, notwithstanding Hailemariam's declaration. (Rest.2d Torts, § 551, com. j, p. 123.) To establish a duty to disclose under section 551(2)(e) of the Restatement Second

---

[12]    In so concluding, we reject Big O's contention that the then-effective federal regulations concerning UFOCs barred it from disclosing Anderson's pro forma. Under those regulations, franchisors were permitted to make representations of "a specific level of potential sales, income, gross or net profit" to a prospective franchisee in a "written document" provided that certain warnings were given and stringent requirements were met. (Former 16 C.F.R. § 437.1(a), (b) (2008).)

of Torts, the plaintiff must show that the defendant knew that the plaintiff reasonably expected the pertinent disclosure. (*Burman v. Richmond Homes Ltd.* (Colo.App. 1991) 821 P.2d 913, 918 (*Burman*).) Here, both pro formas portrayed appellants' store as viable, but projected different levels of sales and profits. Nothing before us suggests that Hailemariam told Anderson that achieving the specific high sales and profits in Hailemariam's pro forma was critical to his decision to go forward with the transaction, or that a particular level of profit was "an important part of the substance of what [he] bargained for." (Rest.2d Torts, § 551, com. j, p. 123.) On the contrary, when Anderson questioned Hailemariam's draft pro forma, Hailemariam adjusted his pro forma, without suggesting that his previous figures were critical to his decision to go forward.

We also conclude there are no triable issues regarding whether Hailemariam reasonably relied on Anderson's conduct as an assurance that he need not prepare a more conservative estimate of the store's prospects. Under the "inquiry notice" doctrine, appellants are properly charged with the information they could have discovered upon proper notice. (*Burman*, *supra*, 821 P.2d at p. 919.) Here, Anderson's skepticism regarding Hailemariam's projected market share placed him on notice that it was appropriate to explore more conservative financial assumptions. The record discloses no evidence of any obstacle that would have prevented Hailemariam from developing less optimistic estimates akin to those found in Big O's pro forma. In sum, appellants' claim that Big O fraudulently concealed its pro forma fails for want of a triable issue.[13]

---

[13] In view of our conclusions, we observe that none of the other situations in which a duty to disclose may arise are present here. Regarding those situations, section 551(2) of the Restatement Second of Torts states that the party to a business transaction must disclose the following facts: "(a) matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; and [¶] (b) matters known to him that he knows to be necessary to prevent his partial or

*(Fn. continued on next page.)*

26

c. *Excluded Portions of Hailemariam's Declaration*

Appellants argue that the trial court incorrectly excluded key portions of Hailemariam's declaration on the ground that his statements contradicted his deposition testimony or other discovery responses. As explained below, we find no reversible error.

i. *Governing Principles*

Our review of the rulings is governed by "the well settled rule that '"[a] party cannot create an issue of fact by a declaration which contradicts his prior [discovery responses]. [Citation.] In determining whether any triable issue of material fact exists, the trial court may, in its discretion, give great weight to admissions made in deposition and disregard contradictory and self-serving affidavits of the party.'" (*Benavidez v. San Jose Police Department* (1999) 71 Cal.App.4th 853, 860, quoting *Preach v. Monter Rainbow* (1993) 12 Cal.App.4th 1441, 1451.) This rule is traceable to *D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 22, which explained that for purposes of the summary judgment statute, "admissions against interest" have an especially high credibility

---

ambiguous statement of the facts from being misleading; and [¶] (c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so; and [¶] (d) the falsity of a representation not made with the expectation that it would be acted upon, if he subsequently learns that the other is about to act in reliance upon it in a transaction with him." Here, Big O was not in a fiduciary relationship with Hailemariam, and it disclaimed any duty to provide appellants with financial information not found in the UFOC; moreover, Anderson made no representation that called for subsequent clarification or elaboration.

value when they are obtained "in the context of an established pretrial procedure whose purpose is to elicit facts."[14]

### ii. *Ketchem's Remarks*

Appellants contend the trial court improperly excluded evidence that Ketchem advised Hailemariam not to read the UFOC. Regarding this matter, the trial court sustained Big O's objection to Hailemariam's statement that after he received the UFOC, Ketchem told him that the UFOC "was simply a formality," and that "he would tell [Hailemariam] about the business." Hailemariam's declaration further stated that he paid little attention to the UFOC in light of these remarks. Big O argued that Hailemariam's description of Ketchem's remarks contradicted Hailemariam's deposition testimony. The trial court agreed.

Pointing to *Scalf*, *supra*, 128 Cal.App.4th 1510, appellants maintain that the trial court erred. As explained in *Scalf*, a party's declaration statements should not be excluded when the party made only "'tacit admissions or fragmentary and equivocal concessions'" in discovery, or when there is "other credible evidence that contradicts or explains that party's [discovery responses] or otherwise demonstrates there are genuine issues of factual dispute." (128 Cal.App.4th at

---

[14]    At the outset, we reject appellants' suggestion that the trial court's determinations under the rule are properly reviewed de novo. Although our Supreme Court recently declined to specify the appropriate standard of review for the trial court's evidentiary determinations in connection with summary judgment (*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 535), the majority of appellate courts examine them for an abuse of discretion (see, e.g., *Caloroso v. Hathaway* (2004) 122 Cal.App.4th 922, 928-929; *Walker v. Countrywide Home Loans, Inc.* (2002) 98 Cal.App.4th 1158, 1169), including determinations under the rule at issue here (*Preach v. Monter Rainbow*, *supra*, 12 Cal.App.4th at p. 1451; *Benavidez v. San Jose Police Dept.*, *supra*, 71 Cal.App.4th at p. 860; *Scalf v. D.B. Log Homes, Inc.* (2005) 128 Cal.App.4th 1510, 1525 (*Scalf*)). However, for the reasons explained below, we would find no reversible error regarding the rulings, even were we to review them de novo.

28

pp. 1523-1525, quoting *Price v. Wells Fargo Bank* (1989) 213 Cal.App.3d 465, 482, overruled on another ground in *Riverisland Cold Storage, Inc. v. Fresno-Madera Production Credit Assn.*, *supra*, 55 Cal.4th at p. 1182.)  Here, appellants argue that the portions of Hailemariam's deposition that Big O cited in connection with its objection have little bearing on Hailemariam's declaration statements.

Although we agree that the cited portions of the deposition (as found in the record) do not support the exclusion of Hailemariam's declaration statements, we nonetheless reject appellants' contention, as we may affirm the trial court's ruling on any grounds properly supported by the record.  (*Philip Chang & Sons Associates v. La Casa Novato* (1986) 177 Cal.App.3d 159, 172-173).  In excluding the declaration statements, the trial court appears to have considered portions of Hailemariam's deposition other than those cited by Big O cited in support of its objection.  In those portions of the deposition, Hailemariam testified that he never discussed the UFOC with any Big O representative at any time prior to executing the franchise agreement, and otherwise paid little attention to the UFOC.  We therefore see no basis to reverse the trial court's ruling.

### iii.  *Reduction in Big O's Tire Lines and Failure to Develop New Products*

Appellants contend the court improperly barred Hailemariam's declaration statement that despite Big O's assurances that it was developing new products, no one told him that Big O had in fact reduced the number of its proprietary tire lines during the period from 2000 to 2008.  In our view, the court did not err, as Hailemariam testified in his deposition that he recalled no specific pre-agreement assurances from Big O regarding "anything new," and his declaration offered no explanation for the departure from prior testimony.

29

Nor would we regard the ruling as prejudicial if it were incorrect. The franchise agreement and UFOC set forth Big O's obligations to appellants in detail; furthermore, it is undisputed that Hailemariam, in executing the franchise agreement, signed a separate closing acknowledgment that stated: "I am not relying on any promises of Big O which are not contained in the Big O franchise agreement." Because the franchise agreement contains no term obliging Big O to develop new products or services, appellants could not have reasonably relied on assurances or omissions regarding new products. In addition, appellants cannot show reasonable reliance with respect to Big O's purported concealment of the number of its tire lines, as the record establishes that Hailemariam visited Big O Stores during the three-year negotiation period, and was thus well-positioned to discover that number.

### iv. *Remaining Rulings*

For the reasons discussed below, it is unnecessary for us to examine whether the trial court properly excluded Hailemariam's other declaration statements, as those statements raise no triable issues regarding appellants' fraud claim. In the excluded portions of the declaration, Hailemariam stated (1) that he "had to rely solely on Big O in choosing a [store] location" because he "had no idea how to pick a suitable location"; (2) that he relied "totally" on Big O to choose his store's equipment because he "had no idea what type of equipment" to choose; (3) that after Big O told Hailemariam that he "[had] to have an experienced manager for 18 months" and promise to hire one, it chose a "good manager" who quit before the 18-month period ended; and (4) that no one told him that a large franchisee with 28 years in Big O's system had terminated his business due to Big O's inability to supply tires.

Regarding item (1), the UFOC identified "site selection and

30

acquisition/lease" as among the franchisee's obligations, and further stated: "[T]he final decision about whether to acquire a given approved site . . . shall be your sole decision. . . . Our approval of a site . . . does not constitute a representation or warranty of any kind as to the suitability of the site for a Big O store . . . . It only indicates that we believe that the site falls within the acceptable criteria established by us." This language in the UFOC precludes reasonable reliance on any oral representations that Big O's would choose a successful store location. (*Colorado Coffee Bean*, *supra*, 251 P.3d at pp. 19-20.)

Regarding items (2) and (3), the UFOC and franchise agreement impose limited duties on Big O regarding the selection of equipment for new stores and the hiring of managers. Big O's sole duty regarding the selection of equipment for a new store was to provide a "prototype . . . equipment layout"; furthermore, the UFOC and agreement permit the franchisee to delegate store operations only to "a [m]anager employed by the [f]ranchisee . . . subject to approval by Big O."

With respect to the former duty, the record discloses that after Big O proposed three equipment packages for the store, Hailemariam selected one of them. Although neither the UFOC nor the agreement specifically disclaim Big O's liability for equipment packages that it proposed, the UFOC states that Big O did not guarantee "in any manner" that Hailemariam's store would be successful; moreover, as noted above, in executing the agreement, Hailemariam acknowledged that he relied on no promises not contained in it. Accordingly, appellants could not have reasonably relied on any oral representation that Big O would propose equipment that assured the success of their store. (*Universal Drilling*, *supra*, 737 F.2d at pp. 872-873.)

The purported promise regarding the manager also raises no triable issues regarding the existence of fraud in the inducement. The promise itself cannot be regarded as a tortious misrepresentation under Colorado law. As explained in

31

*Nelson v. Gas Research Inst.* (Colo.App. 2005) 121 P.3d 340, 343, "[f]raud requires more than the mere nonperformance of a promise or the failure to fulfill an agreement to do something at a future time. [Citation]. . . . . Such promises are actionable only where there is proof that the defendant had the present intention not to fulfill the promise. [Citation.]" According to Hailemariam's declaration, Big O selected a "good manager" who left appellants' employment only *after* they executed the agreement and opened their store. There is thus no evidence that Big O lacked the intention to fulfill the promise when it was made. In addition, for the reasons explained above, appellants could not have reasonably relied on the promise, in view of the limited obligations imposed upon Big O in the UFOC and franchise agreement.

Finally, regarding item (4), the UFOC enumerated franchises that had been transferred, cancelled, or terminated prior to appellants' execution of the franchise agreement, and provided contact information for franchisees who had "[l]eft the [s]ystem." These disclosures appear to have included the specific former franchisee that Big O purportedly concealed.[15] Accordingly, nothing before us suggests that Big O failed to disclose information regarding failed or terminated franchises material to Hailemariam's decision to go forward. In sum, appellant's fraud claim fails for want of triable issues of fact.

---

[15] Hailemariam's declaration described the person in question as a large franchisee with 28 years in Big O's system, but did not name him. As Big O's brief notes, however, the description applies to a specific former franchisee identified elsewhere in appellants' evidentiary showing, namely, David Sauter. As Big O further observes, the UFOC provided contact information for Sauter as a franchisee who had left Big O's system. Appellants' reply brief does not challenge Big O's identification of the former franchisee as Sauter.

F.  *Breach of Contract Claim*

We turn to appellants' challenges to the grant of summary judgment on the breach of contract claim.  They argue (1) that for purposes of the application of the parol evidence rule, the integration clause in the franchise agreement does not incorporate the UFOC into the agreement, and (2) that there are triable issues regarding their claim.  As explained below, we disagree.

1.  *Scope of the Integration Clause*

Appellants maintain that the UFOC is not a part of the franchise agreement, notwithstanding the integration clause.  They argue that the definition of the term "Agreement" contained within the franchise agreement itself does not refer to the UFOC, as it states only:  "Agreement – This Agreement, the Summary Pages and all Riders and Schedules hereto."  In addition, they assert that the integration clause does not encompass any document unsigned by Hailemariam, including the UFOC.  We reject this contention.

Under Colorado law, in interpreting a contract provision, courts look first to the "plain and ordinary meaning" of the provision's language, viewed in the context of the entire contract.  (*Engineered Data Prods., Inc. v. Nova Office Furniture, Inc.* (D.Colo. 1994) 849 F.Supp. 1412, 1417.)  Here, the integration clause states:  "Franchisee acknowledges that this [a]greement, *the documents referred to herein*, . . . and other agreements signed concurrently . . . , if any, constitute *the entire, full and complete* [a]greement . . . .  This [a]greement terminates and supersedes any prior agreement between the parties concerning the same subject matter and any oral or written representations which are inconsistent with the terms of this instrument and *its accompanying Franchise Offering*

*Circular.*" (Italics added.) The integration clause thus incorporates the UFOC within the franchise agreement by expressly referring to it.[16]

### 2. *No Triable Issues*

Appellants also contend there are triable issues whether Big O complied with the agreement. They argue that Big O breached its contractual obligation to appellants "to enhance the[ir] competitive posture" by (1) selling tires to other franchisees at a lower price, (2) directing Hailemariam to sell unsuitable or discontinued tire lines, (3) selling Hailemariam unnecessary equipment, and (4) providing products and services indistinguishable from competitors. We disagree.

Because the franchise agreement is fully integrated, we apply the parol evidence rule and disregard appellants' showing regarding promises external to the agreement, including those items of evidence that the trial court excluded under the rule. At the outset, we observe that the agreement imposed no obligation on Big O to "to enhance [appellants'] competitive posture." Concerning this purported obligation, appellants point to Big O's statement in a section entitled "Recitals" that "[s]ince its inception," Big O has acted "to enhance the competitive posture of its franchisees." However, under Colorado law, recitals do no enlarge the duties imposed in a contract. As the Colorado Supreme Court has explained, "'[w]hile recitals may have a material influence on the construction of the instrument and the determination of the intent of the parties, they are not strictly any part of the contract. Hence recitals where wider than the contractual stipulations cannot

---

[16] Because we conclude that the franchise agreement includes the UFOC, we do not address appellants' contention that federal regulations prohibit the use of an integration clause in a franchise agreement to disclaim reliance on representations made in a UFOC. Appellants have identified no representation in the UFOC that Big O attempts to avoid by reference to the integration clause.

34

extend them.'" (*Las Animas Consol. Canal Co. v. Hinderlider* (Colo. 1937) 100 Colo. 508, 511-512 [68 P.2d 564, 566], quoting 13 C.J. § 502, p. 538.)[17]

Regarding the sale of tires to other franchisees, the agreement contains no provision obliging Big O to supply tires to franchisees at uniform prices. Although the agreement obliged Big O to make "reasonable commercial efforts to maintain a competitive source of supply for the benefit of its franchises," the agreement required Big O to provide tires only "to the extent available," and permitted Big O to set the recommended prices for the tires. Furthermore, as the trial court noted, the UFOC states: "The prices charged to [appellants] . . . shall be established by Big O . . . from time to time." Accordingly, the agreement imposed no requirement on Big O to sell tires to all franchises at the same price.[18]

Regarding the selection of tires, the agreement obliged Big O only to "assist[]" appellants in selecting their initial inventory. Although the record establishes Big O selected an initial inventory for appellants and afforded them the right to return unsold tires, appellants maintain that Big O breached the agreement by selecting an inadequate initial inventory. However, as the franchise agreement disclaimed Big O's liability for the success of appellant's store, the agreement conveyed no guarantee or warranty by Big O regarding the adequacy of the inventory.

Regarding the selection of equipment, the agreement obliged Big O to propose a "prototype . . . equipment layout" for the store, and authorized Big O to require appellant to buy equipment that it approved; in addition, the agreement

---

[17]   On a related matter, we observe that appellants do not discuss the implied covenant of good faith and fair dealing in connection with their breach of contract claim. For this reason, they have forfeited any contention that Big O breached the covenant in exercising any discretion afforded it under the provisions of the franchise agreement.

[18]   The agreement also disclosed that Big O sold tires at different prices to the two types of franchisee.

35

stated that the cost of appropriate equipment and fixtures ordinarily ranged from $100,000 to $220,000, depending on whether the franchisee bought new or used equipment. The record establishes that when Big O offered Hailemariam three options concerning equipment, he chose an option valued at $177,906, and later bought more equipment. In view of these facts, we see no breach of the agreement.

Finally, regarding Big O's products and services, the agreement contains no provision requiring Big O to provide distinctive products or services. Furthermore, as noted above (see E.2.c.ii., *ante*), the trial court properly excluded Hailemariam's declaration statements regarding assurances of new products and services on the ground that the statements contradicted Hailemariam's deposition testimony. We therefore conclude that summary judgment was properly granted on appellants' claims.

## DISPOSITION

The judgment is affirmed.  Big O is awarded its costs.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


MANELLA, J.

We concur:


WILLHITE, Acting P. J.


SUZUKAWA, J.